*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CHLOE O., | ) | |
| | ) | Supreme Court No. S-14771 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-10-00232 CN |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 6828 – September 20, 2013 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter A. Michalski and Catherine M. Easter, Judges.

Appearances: Marjorie K. Allard, Assistant Public Defender, Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Janell M. Hafner, Assistant Attorney General, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.

## I.    INTRODUCTION

Chloe O.[1] has a long history of substance abuse and mental health issues. In August 2010, OCS took Chloe's fifteen-month-old daughter, Ashanti, into emergency custody because of Chloe's drug abuse, suicide attempts, assaultive behaviors, and affinity for unsafe people and situations. OCS made many unsuccessful attempts to assist Chloe in obtaining treatment for her substance abuse issues and, eventually, for her mental health issues.

Following a trial, the trial court terminated Chloe's parental rights to Ashanti. In doing so the trial court found that OCS made active efforts to reunify Chloe's family by a preponderance of the evidence, rather than by the proper clear and convincing evidence standard.[2] Chloe appealed the trial court's termination order on several grounds, one of which was a challenge to the trial court's finding that OCS had made active efforts to reunify her family. Before briefing was completed the parties agreed that the case should be remanded to allow the trial court to reconsider the active efforts question under the correct evidentiary standard. Superior Court Judge Catherine Easter held an evidentiary hearing on the issue of reunification efforts because the original trial judge, Superior Court Judge Peter Michalski, had retired in the interim. Judge Easter found, by clear and convincing evidence, that OCS had made active efforts to reunify Chloe's family.

Chloe's appeal requires us to address four issues. We first decide whether, in reviewing Judge Easter's ruling that OCS made active efforts to reunify Chloe with Ashanti, we are limited to considering the evidence presented at the hearing on remand,

---

[1]    Pseudonyms are used throughout to protect the privacy of the parties.

[2]    OCS was required to make active reunification efforts because Chloe is an Indian child for purposes of the Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963.

or whether we may also consider evidence that was presented at the initial hearing before Judge Michalski. We conclude that our review of this issue is limited to the evidence presented to Judge Easter on remand.

Second, we conclude that the trial court's finding that OCS provided Chloe with active efforts to reunify her family is supported by clear and convincing evidence. Third, we conclude that the trial court did not err when it found, beyond a reasonable doubt, that Ashanti would likely suffer serious harm if she were returned to Chloe's custody. Finally, we conclude that we are not required to remand this matter to allow the trial court to investigate whether Chloe's attorney provided her with ineffective assistance.

## II. FACTS AND PROCEEDINGS

### A. Ashanti Is Taken Into OCS's Custody.

Chloe began using marijuana and alcohol in her pre-teen years, and by age 18 she was regularly using marijuana, alcohol, cocaine, and hallucinogens. She spent most of her youth in foster care, in the custody of OCS and the Division of Juvenile Justice (DJJ). She was institutionalized multiple times as a minor because of her mental health and substance abuse issues, and by the time she reached adulthood she had been prescribed antidepressant and antipsychotic medications; the record indicates that she may suffer from bipolar disorder and fetal alcohol syndrome (FAS).

In May 2009, 18-year-old Chloe gave birth to Ashanti. While pregnant, Chloe used cocaine, alcohol, and marijuana. When Ashanti was seven weeks old, Chloe asked Autumn P. — a woman who had acted as Chloe's foster mother when Chloe was a teenager — to care for the baby while Chloe tended to pressing family matters. This arrangement was originally to be for a matter of days, but when Chloe decided to enter a substance abuse treatment program Autumn agreed to continue caring for Ashanti. The record does not indicate that Chloe entered treatment; nonetheless, Ashanti remained in

Autumn's care. At the time, Autumn, a licensed DJJ foster parent, was also caring for several teenage foster children and her own young daughter.

While Autumn was caring for Ashanti, Chloe sometimes took the child. During such times OCS received reports concerning Ashanti's safety. OCS investigated reports concerning Chloe's substance abuse, mental health, suicide attempts, and exposure of Ashanti to unsafe situations.

In August 2010, OCS took emergency custody of Ashanti after Chloe was arrested and incarcerated following a violent altercation. The trial court adjudicated Ashanti a child in need of aid and committed her to OCS's temporary custody. OCS placed Ashanti with Autumn, who had been the child's main caregiver for more than a year.

**B.      Chloe Declines To Participate In Mental Health Services; She Engages, Unsuccessfully, In Substance Abuse Treatment.**

Chloe's OCS case plan called for her to participate in a substance abuse assessment and treatment, urinalysis testing, a mental health evaluation, parenting classes, and visitation with Ashanti, and it required her to acquire stable housing and employment. According to social worker Jamie Kaufman-Bacher, who was responsible for the case from April through September 2010, Chloe was not concerned about her use of substances. She agreed to participate in substance abuse treatment, but she "outright refused" to participate in mental health services. Kaufman-Bacher decided to focus her initial efforts on Chloe's substance abuse rather than her mental health issues. Kaufman-Bacher testified that this decision was based on several factors: Chloe refused to participate in a mental health assessment; it is not possible to force an unwilling client to accept mental health treatment; substance abuse was an important issue that Chloe was willing to work on; and Kaufman-Bacher did not want to overwhelm Chloe by involving her in too many services at once.

While drafting the case plan, Kaufman-Bacher consulted an OCS social worker who had worked with Chloe's family when Chloe was a minor. That worker told Kaufman-Bacher that Chloe might have fetal alcohol syndrome. Kaufman-Bacher, who was trained in FAS, testified that social workers and service providers interact in a particular way with FAS clients, and she included the information about Chloe's possible FAS status in her referral for Chloe to participate in a substance abuse assessment. Kaufman-Bacher transferred the case to social worker Toi Registe in September 2010. At that time, Chloe had declined to fill out paperwork that was required for her to participate in a substance abuse assessment through the Salvation Army Clitheroe Center, and the assessment had been rescheduled.

Registe, who had the case from September 2010 through the termination trial, met with Chloe monthly.[3] At their first meeting Registe and Chloe discussed Chloe's need to participate in substance abuse and mental health services. Chloe informed Registe that she would not participate in the mental health component of her case plan, but she agreed to participate in substance abuse services. Registe, like Kaufman-Bacher, felt that the best course was to focus initially on Chloe's substance abuse issues. Registe testified that she was aware of Chloe's possible FAS status. She testified that she routinely helps FAS clients fill out referral forms in her office, avoids imposing too many case plan components on them at any point in time, writes reminder notes for them, and provides them with reminder phone calls. As to Chloe, Registe testified that "there were many . . . times that whatever referral we were doing, we did

---

[3]    Registe testified that she had difficulty meeting with Chloe because Chloe missed appointments and did not show up when the appointments were rescheduled. Registe also testified that she often met with Chloe before or after Chloe's scheduled visits with Ashanti at the OCS office.

together. I would remind [her] of, you know, court reviews, her family contact, [and] assessments. I've even offered to cab her to those."

In October 2010 Chloe participated in a substance abuse assessment through Clitheroe; the recommendation was for outpatient treatment. Chloe did not follow through with the referral, nor did she participate in urinalysis to which both Kaufman-Bacher and Registe had referred her, despite the social workers' emphasis on the importance of her participation and their explanation that missed urinalysis tests are considered positive by OCS.[4] When Chloe's substance abuse assessment expired in February 2011 Registe referred her to a case management and substance abuse program at Alaska Women's Resource Center. Chloe's case manager at that program scheduled weekly meetings with Chloe.[5] Chloe missed numerous scheduled substance abuse assessments at AWRC before finally completing an assessment on April 18, 2011, when Registe arranged for a taxi to take her to the assessment.[6]

Shortly before this assessment, on April 12, 2011, Chloe gave birth to her second daughter, Samara C., who quickly joined Ashanti in OCS's custody. Also at

---

[4]     Over the course of the case Chloe was referred to participate in urinalysis testing several times. She missed many more scheduled tests than she completed, and every urinalysis she completed tested positive. Registe testified that Chloe missed 74 tests and tested positive 16 times. Chloe explained her reluctance to participate in urinalysis by stating, "I didn't agree with them at times and at times I just didn't go."

[5]     Registe testified that the AWRC case manager's role was similar to any case manager's, which was "to help [Chloe] get any necessary assessments, treatment, any other services that [Chloe] needed," but the advantage of AWRC was that it provided a case manager to meet with Chloe every week.

[6]     Registe testified that normally AWRC only allows three missed appointments before terminating a client from the program but that they made an exception for Chloe, due to Registe's continual interactions with Chloe's AWRC case manager.

about this time, Chloe tested positive for marijuana and methamphetamine. She admitted using marijuana but denied knowingly using methamphetamine, speculating that her marijuana may have been laced with it.

Chloe's assessment recommended medium-intensity residential treatment. She enrolled in a program at Stepping Stones, where OCS planned to have Samara placed with her after a 30-day orientation period, but Chloe left the program after only a few days, because, according to Registe, "[s]he did not like the people up in her business."[7] After Registe and Chloe's AWRC case manager intervened, Stepping Stones agreed to allow Chloe to rejoin the program, but this time she left before completing the intake process.

Chloe's case managers continued to investigate treatment programs, but with little success other than to have Chloe's name added to months-long waiting lists for several programs. Chloe, who continued to use drugs, was dismissed from the AWRC program in May 2011 after not completing papers to allow her to be considered for additional treatment programs.

On June 1, 2011, on a referral from OCS, Chloe participated in another substance abuse assessment at Clitheroe. The assessor recommended a 90-to-120-day residential treatment program, to be followed by 24 weeks of outpatient treatment, and also recommended that Chloe follow up with a mental health provider. Registe attempted to have Chloe admitted to a dual-diagnosis treatment program at the Ernie Turner Center, but her criminal history rendered her ineligible for that program. Registe

---

[7]     The Stepping Stones program included a parenting class component. Parenting classes were required by Chloe's case plan. Registe testified that before Chloe's admission to Stepping Stones, Registe had referred her to a hands-on parenting class but that Chloe had declined to participate.

helped Chloe apply to a dual-diagnosis program at Clitheroe, where she was placed on a waiting list.

Around this time, Chloe agreed to participate in a mental health assessment. Registe referred Chloe for an assessment at Southcentral Foundation, which she completed on June 30, 2011. Chloe's diagnoses included posttraumatic stress disorder, attention deficit/hyperactivity disorder, and mood disorder. The assessor recommended that Chloe participate in intensive one-on-one therapy, which, according to Registe, Chloe did "on and off for maybe a month or a month and a half." Registe offered to help Chloe obtain further mental health services but Chloe refused her offer.

In August 2011, when Chloe was about to begin treatment at Clitheroe, she was arrested and charged with reckless endangerment for an incident in which she caused a car accident. One of her resulting probation conditions was to complete a substance abuse treatment program.

On September 13, 2011, Chloe entered the dual-diagnosis program at Clitheroe. She was quickly placed on a behavior contract because of inappropriate language, boundary violations, and missing or being late to treatment sessions. She was discharged from the program after a few weeks.

By February 2012, when the termination trial was held, Chloe was in the process of completing another substance abuse assessment. She began outpatient treatment but participated sporadically and stopped attending in August 2012 after being arrested for using drugs and failing to fulfill her probation requirements. She was scheduled to participate in another substance abuse assessment in November 2012, but she did not show up.

**C.** **The Trial Court Terminates Chloe's Parental Rights To Ashanti, But Employs An Incorrect Standard In Making A Required Finding.**

In August 2011 OCS filed a petition to terminate Chloe's parental rights to Ashanti. Trial was held in February 2012. At the close of the trial the trial court judge, Judge Michalski, made findings on the record that Ashanti was a child in need of aid, Chloe had not remedied conditions that endangered Ashanti, and termination of Chloe's parental rights was in Ashanti's best interests. The trial court also found — by an incorrect standard of proof — that OCS had made active efforts to prevent the family's breakup.[8]

Chloe appealed, arguing in part that the trial court's order was defective because the court used an incorrect standard of proof in its decision. After briefing had begun the parties agreed that the appeal should be remanded to allow the trial court to determine the active-efforts issue under the correct standard of proof. We remanded the case to the trial court for the limited purpose of determining, by the correct standard of proof, whether OCS made active efforts to reunify the family.

**D.** **On Remand The Trial Court Finds, By Clear And Convincing Evidence, That OCS Made Active Efforts To Reunify Chloe With Ashanti.**

Since issuing his decision Judge Michalski had retired, and the case was reassigned to Judge Easter. On January 11, 2013, Judge Easter held an evidentiary hearing "limited for the purpose of the state showing or attempting to show by clear and convincing evidence that they made active efforts to reunify the family." Social workers Kaufman-Bacher and Registe testified at the hearing, as did Chloe.

---

[8]     CINA Rule 18(c)(2)(B) requires this finding to be made by clear and convincing evidence, but the trial court made the finding by a preponderance of evidence.

At the close of the hearing the trial court found, by clear and convincing evidence, that OCS had made active but unsuccessful efforts to reunify the family. According to the trial court the case was not close; the court found that OCS's efforts had been "pretty extraordinary," and it stated "the evidence is overwhelming that the state by clear and convincing evidence made active efforts to reunify this family." The trial court found that OCS's initial focus on Chloe's substance abuse was "clearly indicated . . . because of the mother's resistance to address the mental health issues at that time." It noted with approval OCS's intent to keep Chloe's case plan simple so as not to overwhelm her. The trial court also found that OCS "went above and beyond the call of duty" in providing visitation between Chloe and Ashanti.

The court concluded:

> Quite frankly, I don't know what more the department could've done in this case. And as I said, I think they went beyond the call of duty in trying desperately to get [Chloe] some help so that she could be reunified with [Ashanti] and unfortunately [Chloe] just simply didn't take advantage of the opportunities that were given to her. There's only so much you can do unless a person wants to help themselves and for whatever reason, [Chloe] just simply didn't take advantage of the opportunities that the department gave her such that she could be reunified with her daughter.

The appeal then returned to this court.

## III.   STANDARD OF REVIEW

In CINA cases, we review the trial court's factual findings for clear error and its legal determinations de novo.[9] Factual findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with

---

[9] *Sherman B. v. State, Dep't of Health & Soc. Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011)).

a definite and firm conviction that the trial court's decision was mistaken.[10] Conflicting evidence is generally not sufficient to overturn a trial court's factual findings, and we will not reweigh evidence when the record provides clear support for a trial court's ruling.[11]

Whether OCS made active efforts to provide remedial and rehabilitative services designed to prevent the breakup of the Indian family is a mixed question of fact and law.[12] Whether a parent's due process right to receive effective assistance of counsel was violated is a question of law.[13] Whether a child would likely suffer serious physical or emotional harm if returned to a parent's custody is a question of fact.[14]

## IV. DISCUSSION

### A. Our Review Of The Trial Court's Active Efforts Finding Is Limited To Evidence Presented At The Hearing On Remand.

Chloe's argument that OCS did not provide her with active reunification efforts is based in large part on the testimony of Rose Sandhofer, a witness called by OCS at the initial termination trial. During the hearing on remand, however, Chloe insisted that Judge Easter should not base her decision on a review of the evidence

---

[10]    *Id.* (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[11]    *Id.* at 428 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[12]    *Pravat P. v. State, Dep't of Health & Soc. Servs.*, 249 P.3d 264, 270 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs.*, 235 P.3d 203, 210 (Alaska 2010)).

[13]    *Stanley B. v. State, DFYS*, 93 P.3d 403, 408-09 (Alaska 2004) (citing *S.B. v. State, Dep't of Health & Soc. Servs.*, 61 P.3d 6, 10 (Alaska 2002)).

[14]    *Pravat P.*, 249 P.3d at 270 (citing *Barbara P.*, 234 P.3d at 1253).

presented to Judge Michalski at the original hearing; instead Chloe asked Judge Easter to hold a new evidentiary hearing and decide the active-efforts issue after "observ[ing] the live testimony of the relevant witnesses." At the hearing on remand, neither OCS nor Chloe called Sandhofer to testify, nor did either party ask the trial court to take notice of Sandhofer's earlier testimony. The record does not indicate that Judge Easter reviewed the earlier evidence, nor does Judge Easter's decision make any mention of Sandhofer's testimony.

Nevertheless, Chloe argues that we should consider Sandhofer's testimony when reviewing Judge Easter's finding, on remand, that OCS made active reunification efforts. We find no merit to this argument. On appeal, we review a trial court's decision in light of the evidence presented to that court.[15] Because Sandhofer's testimony was not before the trial court when it made its finding on remand, we do not include Sandhofer's testimony in our review of that finding.

B.     **The Trial Court Did Not Err In Finding, By Clear And Convincing Evidence, That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.**

25 U.S.C. §1912 (d) and Alaska Child in Need of Aid Rule 18(c)(2) require a trial court to find, by clear and convincing evidence, that the State made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family before the court may terminate a parent's parental rights to an Indian child. Courts review OCS's reunification efforts on a case-by-case basis because "no pat formula exists for distinguishing between active and

---

[15]     *Cf. Paula E. v. State, Dep't of Health & Soc. Servs.*, 276 P.3d 422, 430 (Alaska 2012) ("[W]e will consider only the evidence that was admitted at the hearing.").

passive efforts."[16] Generally, active efforts entail a social worker taking a parent through the steps of a reunification case plan, rather than simply devising a plan and requiring the parent to develop his or her own resources.[17] In determining whether active efforts have been made, a court may consider all services provided during the family's involvement with OCS, rather than focus on a distinct period of time.[18] A parent's demonstrated lack of willingness to participate in services may be considered in determining whether the State's efforts were adequate.[19]

Chloe argues that OCS's efforts to provide her with reunification services were flawed in two ways. First, she claims OCS erred in focusing on her substance abuse issues early in the case, rather than simultaneously working to address her mental health issues.[20] Second, she claims that once she agreed to participate in mental health services, OCS did not provide her with adequate services.

As to her first argument, Chloe's social workers focused on her substance abuse issues early in the case because substance abuse was a serious issue that Chloe was

---

[16] *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)) (internal quotation marks omitted).

[17] *Lucy J. v. State, Dep't of Health & Soc. Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[18] *Maisy W.*, 175 P.3d at 1268-69 (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[19] *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001) (citing *A.M.*, 945 P.2d at 306).

[20] Chloe does not challenge the adequacy of the efforts OCS provided in helping her address her substance abuse issues. The record is clear that those efforts were active, but that Chloe did not succeed in the treatment provided.

willing to address, and she flatly refused to participate in mental health services. We agree with the trial court that this approach was sound. As the trial court noted, both substance abuse and mental health issues were "clearly indicated" as areas of concern for Chloe, but "because of the mother's resistance to address the mental health issues at that time . . . the department did the right thing" in initially focusing on Chloe's substance abuse.

Chloe argues that OCS cannot "passively accept a parent's reluctance to participate in a mental health evaluation," but her argument is contradicted by the social worker's testimony that it is not possible to force an unwilling client to participate in mental health treatment. Chloe's assertion that OCS should have obtained a court order requiring her to participate in mental health services is also unavailing. We have stated that "[e]ven putting aside our precedent which excuses further active efforts once the parent expresses an unwillingness to participate, requiring OCS to seek court orders for every uncooperative parent would put a huge and pointless burden on the department and the court system."[21] Thus, the trial court's finding that OCS's action in initially focusing on Chloe's substance abuse issues was appropriate and is adequately supported by the record.

Chloe's second argument, that OCS failed to provide her with adequate mental health services, also fails. OCS referred Chloe for a mental health assessment, which called for her to participate in intensive one-on-one therapy. Chloe began participating in therapy, but she stopped after a few sessions. She then refused her social worker's offer to help her reengage in mental health services. Chloe accepted the social worker's assistance in entering a dual-diagnosis treatment program at Clitheroe, but she was discharged from the program because of her inappropriate behaviors. Given this

---

[21]     *Wilson W.*, 185 P.3d at 102.

record, the trial court's finding that OCS made active but unsuccessful efforts to provide services to reunite Chloe with Ashanti is not in error.

## C. The Trial Court Did Not Err In Finding That Ashanti Would Likely Suffer Serious Harm If Returned To Chloe's Custody.

Before terminating a parent's parental rights to an Indian child, a trial court must find, beyond a reasonable doubt, that returning the child to the parent would likely result in the child suffering serious physical or emotional damage.[22] This finding must be supported by expert testimony.[23] The trial court must find that the parent has engaged in conduct that is likely to harm the child and that the harmful conduct is likely to continue.[24]

Chloe asserts that the trial court's finding that Ashanti would likely suffer serious harm if returned to her custody is not supported by expert testimony. But Rose Sandhofer, an expert in child protection, testified that Ashanti needs the security of a permanent placement and cannot afford to wait for Chloe to resolve the issues that prevent her from acting as Ashanti's parent.[25] Sandhofer testified that Chloe's unresolved substance abuse and mental health issues "would be very concerning to a child of two and a half that is totally dependent on their care provider," and that placing Ashanti with Chloe would be "asking for disaster" and would be "devastating" to Ashanti. Sandhofer's testimony is consistent with the remaining evidence presented to the trial court. We thus find no error in the trial court's finding that continued custody

---

[22] *Pravat P.*, 249 P.3d at 274 (quoting *Ben M. v. State, Dep't of Health & Soc. Servs.*, 204 P.3d 1013, 1019-20 (Alaska 2009)).

[23] *Id.* (citing *Ben M.*, 204 P.3d at 1020).

[24] *Id.*

[25] Sandhofer's testimony is properly before us on this point as this finding was made by Judge Michalski in the original hearing, at which Sandhofer testified.

of Ashanti by Chloe would likely result in Ashanti suffering serious emotional or physical damage.

**D. We Do Not Remand This Appeal To Allow The Trial Court To Determine Whether Chloe Received Ineffective Assistance Of Counsel.**

Finally, Chloe argues that if we determine that we cannot consider Rose Sandhofer's testimony in our review of the trial court's active-efforts finding, we must remand this matter to the trial court for consideration of whether Chloe received ineffective assistance of counsel during the proceeding on remand. She argues that her attorney's failure to call Sandhofer to testify about OCS's reunification efforts on remand may have constituted ineffective assistance.[26]

Chloe is not arguing that she did receive ineffective assistance during the remand hearing, but she is asking us to send the matter back to the trial court for consideration of the issue.[27] We note that a second remand of this appeal would result in a significant additional delay in Ashanti attaining permanency. Our statutes make clear that children's proceedings are to be expeditiously resolved. AS 47.05.065(5) stresses the importance of expeditious placement of children in state custody. AS 47.10.088(k) requires a trial court to rule on a termination petition within 90 days after

---

[26] During the initial hearing Sandhofer, a social worker employed by OCS who was qualified to testify as an expert in matters related to child protection, testified that if she had been assigned to Chloe's case she would have done certain things differently in regard to Chloe's mental health issues. But, ultimately, when asked whether, considering her misgivings about certain aspects of Chloe's case and looking at the case as a whole, she believed OCS had made active efforts to help Chloe, Sandhofer replied, "Absolutely. Without a doubt, no question."

[27] Chloe is represented on appeal by the state public defender's office, the same agency that represented her during the proceeding on remand. As Chloe notes in her brief, any claim of ineffective assistance of counsel should be prosecuted by conflict-free counsel.

the last day of the termination trial. AS 47.10.080(i) imposes a similar 90-day limit for an appeal to be decided. A remand for potentially lengthy litigation of a claim of ineffective assistance of counsel would contravene the language and spirit of these statutes.

In addition, our review of the record convinces us that Chloe's proposed attack on the representation she received during the remand proceeding would not succeed. In order to succeed in an ineffective assistance challenge, a litigant must demonstrate two things. First, she must show that her attorney's performance was below a level that any reasonably competent attorney would provide.[28] An "attorney's reasonable tactical decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken."[29] Second, the litigant must then demonstrate that "an improved . . . performance would have made a difference in the outcome of [the] case."[30] Chloe's challenge could not pass either aspect of this test.

First, it is probable that Chloe's attorney made a reasonable tactical choice in deciding not to call Sandhofer to testify on remand. While Sandhofer criticized aspects of the assigned social workers' approach to Chloe's case, her testimony generally supported OCS's actions, and she ultimately testified that there was "no question" that OCS made active efforts to reunify the family.

Second, it is unlikely that Sandhofer's testimony would have affected the outcome of the case. Chloe points to several of Sandhofer's statements that she feels

---

[28]   *David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 785-86 (Alaska 2012) (quoting *State v. Jones*, 759 P.2d 558, 568 (Alaska App. 1988)).

[29]   *Alexander v. State*, 838 P.2d 269, 273 (Alaska App. 1992) (citing *Jones*, 759 P.2d at 569-70).

[30]   *David S.*, 270 P.3d at 786.

could have influenced the trial court's determination that OCS provided Chloe with active efforts at reunification. The statements may be summarized as follows: (1) given Chloe's history in OCS custody and her potentially serious mental health issues, addressing her mental health issues should have been a priority for her social workers; (2) the social workers should have tried to convince Chloe to participate in mental health services; (3) OCS should have pursued a diagnosis of FAS for Chloe; (4) Chloe should have received a psychiatric assessment rather than a mental health evaluation; and (5) Chloe's abuse of substances may have been an attempt to self-medicate her mental health problems.

However, social workers Kaufman-Bacher and Registe were clearly aware of Chloe's mental health issues and her history with OCS. They each testified that Chloe categorically refused to participate in the mental health portion of her case plan. Sandhofer's testimony does not contradict or diminish Kaufman-Bacher's testimony that it is impossible to force an unwilling client to accept mental health treatment. And Sandhofer testified that it made sense to work with Chloe on issues on which she was willing to work rather than not to work a plan with her at all. Nothing in the record indicates that Chloe's social workers did not try to convince her to accept mental health services. And both Kaufman and Registe testified that they dealt with Chloe as if she had FAS, so a formal diagnosis would have had no bearing on how the social workers approached the case.

Sandhofer also testified Chloe should have received a psychiatric assessment. But the record suggests that Chloe did receive a psychiatric assessment. The assessment Chloe received at Southcentral — which the lawyers and social workers referred to as a mental health assessment — was titled "Intake/Psychiatric Assessment," and it contained a "psychiatric problem list, plan & specific recommendation." The record does not indicate whether Sandhofer ever considered this assessment.

Sandhofer did not testify that Chloe's mental health issues were the cause of her substance abuse issues. She simply "wonder[ed] if the substance abuse is not self-medicating." That speculation provides scant support for Chloe's claims.

Finally, when asked directly whether Sandhofer believed that OCS had made active efforts to reunify Chloe with Ashanti, her response was unequivocal: "Absolutely. Without a doubt, no question." Given this conclusion, we find it extremely unlikely the trial court's decision on remand would have been different had Sandhofer's testimony been before the court.

## V.     CONCLUSION

We AFFIRM the trial court's order terminating Chloe's parental rights to Ashanti.