NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JOURNÉE N., | ) |
| | ) Supreme Court No. S-18151 |
| Appellant, | ) |
| | ) Superior Court Nos. 4FA-19-00259/ |
| v. | ) 00260/00261/00262/00263/00264/ |
| | ) 00265/00266 CN |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) MEMORANDUM OPINION |
| OFFICE OF CHILDREN'S SERVICES, | ) AND JUDGMENT[*] |
| | ) |
| Appellee. | ) No. 1892 – May 11, 2022 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Mark I. Wood, Judge pro tem.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Robert C. Kutchin, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau for Appellee. Nikole V. Schick, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

# I. INTRODUCTION

In 2019 OCS removed a mother's children from her care for the fourth time in ten years. The first three removals resulted in reunification. After the fourth removal,

---

[*] Entered under Alaska Appellate Rule 214.

OCS petitioned to terminate the mother's parental rights. At trial the superior court heard testimony describing OCS's latest involvement with the mother since 2019. After the parties rested, the superior court was troubled that the record did not include much information about OCS's history with the family. The court invited OCS to file a motion to reopen the record. OCS did so, and the court granted the motion. OCS presented additional witnesses, whom the mother had the opportunity to cross-examine. The court then terminated the mother's rights. The mother now appeals, arguing that the court erred by: (1) inviting and granting OCS's motion to reopen the record; and (2) determining that OCS made active efforts. Seeing no error in the superior court's rulings, we affirm the termination order.

## II. FACTS AND PROCEEDINGS

Journée[1] is the mother of eight children, ranging from 3 to 17 years old. All of the children are Indian children for purposes of the Indian Child Welfare Act (ICWA).[2] Journée has a 12-year history with OCS, which has removed her children four times. The first three removals resulted in reunification. The fourth removal resulted in termination of Journée's rights to her six youngest children,[3] which Journée now appeals.

---

[1]    We use pseudonyms to protect the family members' privacy.

[2]    ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

[3]    The two oldest children, Bea and Fran, told OCS that they did not want Journée's parental rights to be terminated. Upon OCS's request, the superior court held the termination petition as to Bea and Fran in abeyance until the court could determine whether a guardianship was in their best interests. We commend OCS and the superior court for respecting the wishes of Bea and Fran by considering guardianship.

The father of the children, Max, also had his parental rights terminated, but Max is not a party to this appeal.

## A.    OCS Removals Of The Children

The first three removals of the children involved Journée's substance abuse and occurred in 2009, 2013, and 2015. The 2013 and 2015 removals also involved neglect. Following each removal, OCS created a case plan and provided Journée with services. Journée engaged in the case plans and was reunited with her children.

The fourth removal occurred in December 2019. Journée left all eight children, then ages 1 through 15, unsupervised at a Fairbanks shelter. When OCS's attempts to contact Journée were unsuccessful, it took emergency custody of the children. The superior court held a hearing on OCS's emergency adjudication petition and granted OCS temporary custody.

OCS searched for Journée from December 2019 to January 2020 by calling her known phone numbers, contacting relatives and tribes associated with her family, and posting on a message board of a shelter where Journée had previously stayed. During that month of searching, OCS learned that the children needed extensive dental work, some of which required surgery under anesthesia. Because OCS could not reach Journée, it had to obtain a court order authorizing the dental treatment.

In addition to having dental needs, the children were behind in school. For example, the oldest child, Bea, was reading at a third-grade level when she was sixteen years old. The children's attendance at school was "almost nonexistent." The two youngest children, Preston and Ilene, exhibited concerning behaviors in foster care. Preston, for instance, took food and hid it daily. He played with his bowel movements and spread them on the walls of the foster home, and also urinated in the dog's water bowl out of anger. Ilene exhibited severe language developmental delay and was placed

in an infant learning program. Ilene was also aggressive with other children and held her breath until she passed out.

## B. OCS Efforts To Provide Services And Programs

Once OCS found Journée, it made efforts to assist her. OCS tried calling, emailing, texting, and messaging her on social media. But Journée was difficult to reach. Her phone number changed frequently. She only occasionally responded to OCS's emails. When OCS was able to successfully contact Journée, it recommended urinalysis testing (UAs), a substance abuse assessment, and domestic violence counseling. OCS provided Journée with instructions on how to complete UAs and how to obtain a substance abuse assessment. OCS explained that Journée needed to sign a release of information so it could speak with service providers about her case and schedule services. But Journée refused to sign, so OCS was unable to schedule appointments for her. Journée also refused to complete UAs, declined a substance abuse assessment, and rejected all treatment options offered by OCS.

OCS scheduled visitation for Journée. OCS initially scheduled in-person visits and provided bus vouchers so that Journée could attend. While buses stopped running for a period of time due to COVID-19, OCS testified that it regularly provided cab vouchers to Journée as well. OCS also scheduled video conference and telephonic visits during the COVID-19 pandemic. Journée attended visits "sporadic[ally]" and often missed them.

Journée's behavior toward OCS was "erratic and aggressive." During one incident at OCS, Journée began digging at her hands with a screwdriver. Another time, Journée pulled something out of her purse that allegedly looked like a Taser, though she returned the item to her purse when a supervisor walked into the room. An OCS caseworker testified that the incident made her feel unsafe around Journée. In yet

another incident at OCS, a caseworker testified that Journée was "extremely agitated" and lunged at a supervisor.

Journée was also arrested for violent behavior. In July 2020 Journée allegedly wielded a baseball bat in a "threatening and destructive" manner in front of some of her children at a foster home. She pled guilty to assault and served a 90-day sentence, and then was subsequently reincarcerated for violating the terms of her probation. Journée was also charged with new felonies (including assault of a cellmate), and at the time of the termination trial was facing several years in prison related to those most recent criminal charges.

Journée's incarceration posed additional scheduling difficulties for OCS. One hurdle was the jail's visitation restrictions during the pandemic. OCS nevertheless tried to schedule telephonic visits with Journée. But when a caseworker reached Journée on the phone, Journée told the caseworker not to call her in jail and hung up. OCS then contacted an OCS supervisor who had previously worked with Journée and — knowing the two had a good rapport — asked the supervisor to talk to her. The supervisor did so and encouraged Journée to be more cooperative with the caseworker. But when the caseworker called Journée again, she refused to engage in conversation. OCS managed to arrange one telephonic visit with the children but was unable to schedule regular visitation.

As for placement, OCS twice sent notice to over 70 relatives of Journée and Max to find an appropriate placement for the children. OCS called and wrote relatives, but many of them were unreachable. For example, many of the phone numbers for the relatives were no longer working numbers, and many of the letters mailed were returned to sender. OCS spoke with Journée's aunt, mother, and cousin when Journée indicated that those family members would be willing to care for the children. But after speaking with the family members, OCS determined that none of them were suitable placements.

With no suitable relatives for placement, OCS initially placed the eight children in five different homes, then three homes, and then, by the time of the termination trial, two homes. Both foster families resided in the Fairbanks area and agreed to maintain sibling contact.

### C.    Adjudication And Termination Trial

In August 2020 the superior court held an adjudication hearing and determined that Max had put the children in need of aid due to abandonment and substance abuse. Journée then stipulated that she had also put the children in need of aid due to her incarceration.

In November 2020 OCS filed a petition to terminate Journée's parental rights. At the termination trial, which began in April 2021, OCS initially presented four witnesses. A child safety and parental risk expert testified that she was concerned about Journée's ability to safely parent her children given her hostile behavior and history of abandoning the children.[4] A tribal cultural expert testified about Iñupiaq cultural values.[5] Two OCS caseworkers testified about OCS's efforts to engage Journée. The caseworkers explained that it was difficult to help Journée with scheduling services and enrolling her in programs because Journée refused to sign the releases of information.

After the four witnesses testified, OCS rested its case. Journée then testified that OCS had not been helpful, that OCS judged her, and that she wished OCS had

---

[4]    *See* 25 U.S.C. § 1912(f) (requiring qualified expert witness testimony); 25 C.F.R. § 23.122(a) ("A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious . . . damage to the child . . . .").

[5]    *See* Bureau of Indian Affairs, Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,830 (June 14, 2016) ("[A] qualified expert witness should normally be required to have knowledge of Tribal social and cultural standards . . . .").

"stuck by [her] side . . . to go through the[] steps" of her case plan. After Journée finished testifying, the parties made closing arguments.

After closing arguments, the court observed that the record lacked evidence about Journée's prior three OCS cases. The court was especially concerned that the record did not contain information about Preston's removal in 2015 and his subsequent reunification. The court wanted to know more about Journée's prior engagement with OCS that had resulted in three reunifications. Although the court could "draw the inference that [Journée] engaged in the services offered and w[as] successful," the court wanted those details in the record.

The court also wanted to know about how the children came into OCS custody in December 2019. The court noted that information was especially important because OCS's witnesses and the guardian ad litem (GAL) had relied on that information at trial. For example, the child safety expert relied on facts about what happened at the time the children were taken into OCS custody, but those facts were not in evidence.

Emphasizing that it was in the best interests of the children for a termination decision to be based on a complete record, the court invited OCS to file a motion as to "whether th[e] record in this termination trial c[ould] be augmented." The court required OCS to include a list of the additional witnesses OCS intended to call and the areas of their testimony. The court noted that the other parties would have an opportunity to respond to OCS's motion. It explained that if OCS declined to file a motion to reopen, the court would make a determination on the existing record. The court emphasized that it was "not ruling" on any issues yet; it "still ha[d] other things to think about based upon the arguments of the parties."

OCS filed a motion to reopen the evidence, which the GAL joined. Journée opposed the motion, arguing that it was governed by Alaska Rule of Civil Procedure 59 and therefore could not be granted unless "required in the interest of justice."[6]

The superior court granted OCS's motion, noting that unlike "typical civil litigation," the focus of termination trials is on the best interests of the children — and the best interests of the children would "not [be] served by a record that is missing critical evidence." The court admonished OCS for "neglect[ing] to present [the evidence] or . . . wrongfully conclud[ing] that it was unnecessary to a reasoned decision on [termination]." But the court also found "[n]o prejudice . . . for the parents who will be able to fully cross-examine [OCS]'s additional witnesses." In granting the motion, the court stressed the importance of a complete record in a termination case and the need for finality and permanency for the children. The court allowed Journée to call additional witnesses as well.

With the record reopened in May 2021, which the court emphasized was a part of "the existing trial" and not "a new trial," OCS presented one of its caseworkers who had previously testified and presented three new witnesses: an OCS supervisor; an OCS visitation coordinator; and a child behavioral and mental health expert. Journée was given the opportunity to cross-examine each of these witnesses. No other witnesses were called, and all parties declined further argument.

The new testimony provided by OCS's witnesses helped to complete the record. The OCS supervisor discussed the events surrounding OCS's assumption of custody in December 2019. The supervisor also testified about the prior OCS removals. The OCS visitation coordinator discussed Journée's inconsistent visitation, noting that

---

[6]     Rule 59 governs new trials, stating that "[a] new trial may be granted . . . if required in the interest of justice." Alaska R. Civ. P. 59(a).

Journée had missed about half of her scheduled visits. The OCS caseworker updated the court about what efforts OCS had made since the last time she testified. She explained that she had called Journée in prison but received "a ton of animosity" from Journée. During one call, Journée said she "wish[ed] that [the caseworker] was in the jail so [Journée] could . . . physically do harm to [the caseworker]." Finally, the behavioral expert talked about Preston and Ilene's concerning behaviors that indicated trauma, food insecurity, and internalized anger.

The superior court terminated Journée's parental rights to the six youngest children.[7] It determined that all of the children were in need of aid under AS 47.10.011(1) (abandonment),[8] (2) (incarceration), (9) (neglect), and (10) (substance abuse). As to the two youngest children only, the superior court found they were in need of aid under subsection 8(A) (mental injury) as well. It determined that Journée's substance abuse and anger management issues had impaired her ability to parent the children.

The court found that OCS made active efforts over the course of 12 years. It emphasized that OCS had persisted despite facing logistical obstacles caused by COVID-19 and Journée's incarceration. Comparing Journée's past three reunifications with the present case, the court found that OCS's efforts in the present case were unsuccessful because Journée's substance abuse and resistance against OCS had worsened.

---

[7]     *See supra* note 3.

[8]     The superior court found "that the only rational explanation for [Journée's] abandonment of the children" was her substance addiction. The record does not show that Journée ever explained why she had disappeared or where she had gone.

The court also found beyond a reasonable doubt that continued custody of the children by Journée would likely result in serious harm. It found by a preponderance of the evidence that termination was in the best interests of the six youngest children.

Journée now appeals.

## III. STANDARD OF REVIEW

"We review a superior court's ruling on a party's request to reopen evidence for abuse of discretion."[9] "Whether OCS made active efforts to provide remedial and rehabilitative services designed to prevent the breakup of the Indian family is a mixed question of fact and law."[10] We review factual findings for clear error and legal determinations de novo.[11] "Factual findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with a definite and firm conviction that the trial court's decision was mistaken."[12]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Inviting And Granting OCS's Motion To Reopen The Record.

Journée challenges the superior court's decision to reopen the record for additional testimony. But she invokes the wrong standard, asserting that "[p]er [Alaska] Civil Rule 59, a judge may grant a new trial 'if required in the interests of justice.' "

---

[9]    *Snider v. Snider*, 357 P.3d 1180, 1184 (Alaska 2015); *see also Sanguinetti v. Sanguinetti*, 628 P.2d 913, 916 n.3 (Alaska 1981) ("[R]ulings of the trial court on . . . re-opening of a case will be disturbed on appeal only where there has been an abuse of discretion."); *Miller v. State*, 462 P.2d 421, 428 (Alaska 1969) (holding that superior court did not abuse its broad discretion in allowing the State to call additional witnesses).

[10]    *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 856 (Alaska 2013).

[11]    *Id.* at 855.

[12]    *Id.* at 855-56.

Civil Rule 59 governs the granting of a new trial — not reopening of the record.[13]  The superior court emphasized it was not granting a new trial but was instead "reopening the existing trial" so that the record could be "augmented."  The court did not close the existing trial before granting OCS's motion or rule on the petition before taking additional evidence.  Nor did it disregard the evidence presented up to that point.  The proper standard is therefore the one governing a court's decision to reopen the record.

Superior courts have "large discretion . . . in permitting a party to reopen after it has rested."[14]  "In deciding whether to hold the record open for additional evidence, a court should consider the importance of the evidence, the diligence of the proponent of the evidence, and the possible prejudice to the other party."[15]  Because a termination decision must be made in the best interests of the child,[16] "it is extremely important that the court be fully informed at the time it makes its . . . decision."[17]

---

[13]    *See* Alaska R. Civ. P. 59(a) ("A new trial may be granted . . . if required in the interest of justice.").

[14]    *Miller*, 462 P.2d at 428 (quoting *Massey v. United States*, 358 F.2d 782, 786 (10th Cir. 1966)).

[15]    *Snider v. Snider*, 357 P.3d 1180, 1186 (Alaska 2015).

[16]    AS 47.10.088(c) ("In a proceeding . . . involving termination of the parental right of a parent, the court shall consider the best interests of the child."); AS 47.10.005 ("The provisions of this chapter shall be liberally construed to . . . promote the child's welfare and the parents' participation in the upbringing of the child to the fullest extent consistent with the child's best interests . . . ."); CINA Rule 1(c) ("These rules will be construed and applied to promote . . . the best interests of the child.").

[17]    *Sanguinetti v. Sanguinetti*, 628 P.2d 913, 916 (Alaska 1981) (discussing the importance of a complete record in child custody determination).

In *Snider* we held it was an abuse of discretion to deny a father's motion to reopen the record in a custody trial.[18] The superior court had signaled to the father that he would have time to present his witnesses.[19] But the court ended the trial earlier than anticipated, before the father could present all of his witnesses.[20] The father asked the court to reopen the record "so that a more complete and adequate picture of this case may be presented before this court issues [its] final decision."[21] The superior court denied the request.[22]

We reversed, considering three relevant factors.[23] We determined that the father's additional evidence was potentially important as it could have made a difference to the superior court's decision; the father had been diligent, reasonably believing he had more time to present evidence; and there was no prejudice to the opposing party since the father's witnesses would be subject to cross-examination.[24] Therefore "it was an abuse of discretion [for the superior court] to refuse to reopen the evidence."[25]

---

[18]     *Snider*, 357 P.3d at 1185.

[19]     *Id.* at 1184-85.

[20]     *Id.* at 1184.

[21]     *Id.* (alteration in original).

[22]     *Id.*

[23]     *Id.* at 1186.

[24]     *Id.* at 1186-87.

[25]     *Id.* at 1185.

Similarly in *Sanguinetti*, a child custody case, the mother moved to reopen the case to introduce a home study report that had not been available at the time of trial.[26] The superior court denied the mother's request.[27] We reversed, emphasizing how "extremely important" it was for the superior court to have "complete information so that it could make an informed judgment based upon the best interests of the child."[28]

And in *Miller*, a criminal case, the State had presented its witnesses and indicated its intent to rest.[29] According to the defendant, the court advised the prosecutor in an off-the-record bench conference that the State's evidence was insufficient to withstand a motion for acquittal.[30] The court then allowed the State to present additional witness testimony.[31] On appeal the defendant argued that the trial court erred by advising the State of the insufficiency of its evidence and by reopening the record.[32] Noting that superior courts have broad discretion to reopen the record, we held that the trial court had not abused its discretion because the defendant had not been prejudiced when the trial court permitted the State to call additional witnesses.[33] As to the defendant's argument that the trial court had improperly advised the State of its evidentiary

---

[26] *Sanguinetti v. Sanguinetti*, 628 P.2d 913, 914-15 (Alaska 1981).

[27] *Id.*

[28] *Id.* at 915-16.

[29] *Miller v. State*, 462 P.2d 421, 427 (Alaska 1969).

[30] *Id.*

[31] *Id.* at 428.

[32] *Id.*

[33] *Id.*

deficiency, we declined to address the argument because there was no objection on the record.[34]

In this case the superior court reasonably weighed the three considerations for assessing a motion to reopen the record. First, as in *Sanguinetti*, the superior court properly emphasized the importance of a complete record in this termination case, when the best interests of the child are paramount.[35] The court stressed that "[t]he 'best interests' of the . . . children are not served by a record that is missing critical evidence." Given our precedent recognizing the "extreme[] importan[ce]" of a complete record when determining a child's best interests, it was reasonable for the court to place great weight on this factor.[36]

Second, the superior court considered OCS's lack of diligence in presenting its case before resting. The court admonished OCS for either "neglect[ing] to present [the evidence] or . . . wrongfully conclud[ing] that [the evidence] was unnecessary to a reasoned decision." Yet although lack of diligence would "[n]ormally" weigh against reopening the record for OCS, the court determined that the importance of a complete record for the best interests of the children outweighed OCS's lack of diligence.

Third, as in *Snider*, the superior court determined that Journée would not be prejudiced by OCS's additional witnesses because she could cross-examine them.

---

[34] *Id.*

[35] Journée insists that "best interests" is the wrong standard for reopening the record, and that instead Civil Rule 59 is the correct standard. She argues that the superior court "conflated the procedural 'in the interests of justice' standard with the 'best interests' of the children, a substantive standard." But as already discussed, Rule 59 governs granting new trials, not reopening the record for supplemental evidence. And the superior court discussed best interests as the focal point of the termination proceeding; it did not, as Journée argues, use best interests as a "procedural standard."

[36] *Sanguinetti v. Sanguinetti*, 628 P.2d 913, 916 (Alaska 1981).

Indeed, the court required OCS to provide in advance a list of the additional witnesses and the areas of their intended testimony, which OCS did. Journée had the opportunity to prepare for and to cross-examine OCS's witnesses during the continued trial.[37] Journée was also given the opportunity to present additional witnesses.

Therefore, although OCS's lack of diligence weighed against reopening the record, the other two considerations — the importance of the evidence and lack of prejudice to Journée — weighed in favor of reopening. In light of the "extreme[] importan[ce]" of "complete information" in making an "informed judgment based upon the best interests of the child,"[38] we see no abuse of discretion in the superior court's decision to reopen the record.

Journée also argues that the court impermissibly *invited* OCS to file a motion to reopen the record.[39] She invokes "procedural due process," "fundamental[] unfair[ness]," and "basic principles of justice" to argue that the superior court "slanted

---

[37] *See Miller*, 462 P.2d at 422 (seeing no abuse of discretion where "[t]here is no suggestion that [reopening the record] surprised the [opposing party]" (quoting *Massey v. United States*, 358 F.2d 782, 786 (10th Cir. 1966))). Journée asserts that *Miller* is "entirely inapt" because there, "the defendant had not even begun its case," whereas both parties here had concluded their case when the court granted OCS's motion to reopen. But Journée fails to explain how the timing of the reopening prejudiced her when she had the opportunity to fully cross-examine OCS's additional witnesses and to present her own additional witnesses.

[38] *Sanguinetti*, 628 P.2d at 915-16.

[39] Journée characterizes the superior court's invitation to file a motion to reopen as advisement to OCS that it "had failed to meet the quantum of evidence required under ICWA." Not so. The superior court never determined that absent the supplemental evidence, OCS could not meet its ICWA burden of proof. The court expressly stated it was not yet making any determinations about the sufficiency of evidence when it gave OCS an opportunity to file a motion to reopen.

the playing field . . . toward the [S]tate."[40]  But she provides no citation to support her due process argument.  Because Journée fails to sufficiently make this argument on appeal, it is waived.[41]

To the extent that Journée is arguing that the superior court judge displayed disqualifying bias, this argument is waived for the same reasons.[42]  Journée asserts that the court exhibited "appalling judicial favoritism," but she fails to articulate any legal argument about why its conduct warrants reversal.[43]  And waiver aside, the record does

---

[40]  We emphasize that a termination trial — where a parent's rights and a child's wellbeing are at stake — is no "playing field."  Rather, the purpose of the proceeding is to protect the best interests of the child while upholding the constitutional rights of the parents.  Thus the analogy to a game in which rules must be rigidly applied is inapposite and inappropriate.  The rules are to be applied so as to facilitate a just and accurate outcome.  *See* CINA Rule 1(c); *see also* Alaska R. Civ. P. 1, 94.

[41]  *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").  It is also unclear to us how Journée could articulate a viable argument under the due process framework, which examines whether a different process would have reduced the risk of erroneous deprivation.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Alex H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 389 P.3d 35, 50 (Alaska 2017).  We do not see how the process that Journée challenges — providing all parties the opportunity to present more evidence to present a fuller picture of the facts to the court — would increase the risk of erroneous deprivation.

[42]  *Adamson*, 819 P.2d at 889 n.3.

[43]  Journée instead relies on OCS's "inability to find a single reported instance of a CINA court acting in the manner of the trial court here."  But OCS provided sufficient examples of courts properly granting motions to reopen or impermissibly denying them.  *E.g.*, *Snider v. Snider*, 357 P.3d 1180, 1186 (Alaska 2015); *Ridley G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-18033, 2021 WL 4999266, at *2-3 (Alaska Oct. 27, 2021).  That these cases involved different procedural postures or subject matter (such as private custody disputes rather than CINA issues)

(continued...)

not show that the superior court acted with disqualifying bias. We have found disqualifying bias when the court "expresses 'an opinion that . . . reveal[s] such a high degree of favoritism . . . as to make fair judgment impossible.' "[44] No such expressions were made here. To the contrary, the superior court admonished OCS for "neglect[ing] to present [critical evidence] or . . . wrongfully conclud[ing] that it was unnecessary" to do so. And the court was balanced in its treatment of the parties. It invited Journée to oppose OCS's motion and offered her a chance to present oral argument. It granted the motion only after weighing the relevant considerations[45] and determining that reopening the record was in the best interests of the children.[46] We see no merit in Journée's disqualifying bias claim.

B.     **The Superior Court Did Not Err By Determining That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.**

The superior court may not terminate parental rights to an Indian child unless it determines that OCS made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that

---

[43]      (...continued)
does not render the cases, as Journée asserts, wholly irrelevant. The same goes for *Miller*, which Journée suggests is irrelevant because it is "a 53 year old criminal case." As discussed above, the trial court's conduct in *Miller* is helpful here as an example of a court properly exercising its broad discretion to reopen the record. *Miller v. State*, 462 P.2d 421, 428 (Alaska 1969).

[44]      *Griswold v. Homer Advisory Planning Comm'n*, 484 P.3d 120, 130 (Alaska 2021) (second alteration in original) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

[45]      *See Snider*, 357 P.3d at 1186.

[46]      *See Kinnan v. Sitka Counseling*, 349 P.3d 153, 160 (Alaska 2015) ("[J]udicial bias should not be inferred merely from adverse rulings." (quoting *Khalsa v. Chose*, 261 P.3d 367, 376 (Alaska 2011))).

these efforts have proved unsuccessful."[47]  Journée challenges the superior court's determination that OCS made active efforts.

Bureau of Indian Affairs (BIA) regulations define "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to . . . reunite an Indian child with his or her family."[48]  Superior courts "have the discretion to consider the facts and circumstances of the particular case before [them] when determining whether the definition of 'active efforts' [has been] met,"[49] and "may consider all services provided during the family's involvement with OCS, rather than focus on a distinct period of time."[50]  Courts may also consider "[a] parent's demonstrated lack of willingness to participate in services."[51]  A parent's "incarceration does not absolve [OCS]'s active efforts duty," but "the court may consider the practical impact of incarceration on the possibility of active remedial efforts."[52]

Journée asserts that OCS failed to make active efforts without specifying what additional efforts it should have made.  She largely argues that OCS should have known what its prior successful efforts were so that OCS could be guided by those efforts in the present case.  But the record shows that caseworkers were aware of OCS's

---

[47] *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009) (quoting 25 U.S.C. § 1912(d)).

[48] 25 C.F.R. § 23.2 (2021).

[49] *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1072 (Alaska 2018) (quoting BUREAU OF INDIAN AFFAIRS, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 55 (Dec. 2016)).

[50] *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 857 (Alaska 2013).

[51] *Id.*

[52] *Jon S.*, 212 P.3d at 763 n.26.

past efforts. For example, one caseworker testified that OCS had reviewed Journée's "case timeline," including the prior three OCS removals. OCS submitted exhibits which the court noted made "pretty clear what was offered" to Journée by OCS in the past, such as counseling, assessments, and inpatient treatment.

Journée also asserts that OCS should have been more respectful and more helpful in explaining the steps of the case plan. The record does not support that assertion. Although Journée's conduct made some OCS workers fearful of her, there is no indication in the record that this fear interfered with their efforts or that OCS ever disrespected her. For example, OCS texted Journée instructions on how to access services and testing. OCS explained the rehabilitation programs that Journée could complete to reunify with her children, as she had done in the past. OCS asked one of Journée's prior caseworkers, with whom Journée had a good relationship, to encourage Journée to engage with OCS. OCS tried different methods of communication to reach Journée, including calls, emails, and social media messages. The superior court found that Journée had failed to engage in services not because she did not understand the case plan or needed better assistance, but because her substance abuse and her resistance toward OCS had worsened. The record supports this finding. There is also no indication in the record that OCS acted with "implicit racial prejudice," as Journée suggests on appeal, albeit without pointing to any specific examples.

Journée further argues that OCS's efforts were too formulaic: OCS used "[f]orm case plans, form referrals, form meetings, and form reports." But some of the efforts described above were specifically tailored to Journée. And nothing prohibits OCS from using standardized forms to promote consistency and efficiency. Because many families involved with OCS face similar challenges — addiction, domestic violence, mental health problems, or lack of parenting skills — the efforts toward those families may appear similar too.

We agree with the superior court's determination that OCS's efforts were active. OCS made extensive efforts over 12 years.[53] In the prior three cases, OCS offered counseling, assessments, and a 28-day inpatient treatment program, all of which Journée engaged in. In the present case, beginning in 2019 and lasting 16 months, OCS tried to develop a case plan with Journée, referred her to services and testing, and attempted to find a relative placement for the children. OCS tried to communicate with Journée both in and out of prison. It provided instructions for obtaining services and testing. It scheduled in-person, virtual, and telephonic visitation with the children. And it provided vouchers for transportation. OCS persisted in making active efforts even though it faced logistical obstacles due to COVID-19 and Journée's incarceration.

But Journée refused to engage with OCS. She refused to sign a release of information, which was necessary for OCS to share Journée's information with service providers and to book appointments for her. Journée hung up on her OCS caseworker when the caseworker tried to schedule visitation, made her caseworker feel unsafe during a meeting, and lunged at an OCS supervisor. Despite this resistance, OCS continued its efforts and tried to find a solution to accommodate Journée. The caseworker asked a colleague who had good rapport with Journée to encourage her to cooperate with OCS. But Journée ultimately did not engage in the recommended services or treatment. The record thus supports the superior court's finding that "the real reason why [OCS's]

---

[53] Journée also appears to argue that if OCS's efforts in past involvements with Journée were not "active," then OCS's efforts in its present involvement should likewise be deemed insufficient. We decline to require superior courts to make a finding on the sufficiency of OCS's present efforts based solely on the sufficiency of its past efforts. As discussed above, superior courts may "consider all services provided during the family's involvement with OCS, rather than focus on a distinct period of time." *Chloe O.*, 309 P.3d at 857. We also observe that the three successful prior reunifications undercut Journée's suggestion that OCS did not make active efforts in the past.

efforts were unsuccessful" was Journée's failure to cooperate with those efforts.[54]  We

see no error in the superior court's ruling that active efforts were made.

## V.  CONCLUSION

We AFFIRM the superior court's decision to terminate Journée's parental

rights.

---

[54]     To the extent that Journée suggests OCS used COVID-19 as pretext for providing limited efforts, the record does not support this argument.  To the contrary, the record shows that despite COVID-19 limitations, OCS tried to work with Journée.  For example, after OCS's COVID-19 protocols were in place, OCS scheduled virtual visits where Journée would come to OCS for video visits with her children.