*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RONAN F., | ) | |
| | ) | Supreme Court Nos. S-18588/18628 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court No. |
| | ) | 4FA-19-00043/00044 CN |
| STATE OF ALASKA, DEPARTMENT | ) | (Consolidated) |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF | ) | O P I N I O N |
| CHILDREN'S SERVICES, | ) | |
| | ) | No. 7676 – December 15, 2023 |
| Appellee. | ) | |
| | ) | |
| ELENA F., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeals from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Terrence P. Haas, Judge.

Appearances: Michael L. Horowitz, Kingsley, Michigan, for Appellant Ronan F. Katrina Larsen, Ketchikan, for Appellant Elena F. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg Taylor, Attorney

General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

CARNEY, Justice.

## I. INTRODUCTION

The Office of Children's Services (OCS) removed two Indian children from their parents' home because of reported domestic violence. The superior court terminated both parents' parental rights two years later. The parents appeal, arguing that OCS failed to make active efforts to reunify the family. Because OCS failed to make active efforts toward the father, we reverse the termination of his parental rights. We affirm the termination of the mother's parental rights.

## II. FACTS AND PROCEEDINGS

### A. Background Leading to Removal of the Children

Elena F. and Ronan F.[1] are the parents of two Indian children: Yannis, born in 2016, and Yuri, born in 2018.[2] OCS received 14 reports of concern about the children's welfare between 2016 and early 2019. Yannis tested positive for marijuana and alcohol when he was born; OCS took emergency custody of Yannis a few months later due to concerns of alcohol abuse and domestic violence at home, but he was returned to his parents in February 2018. Yuri tested positive for marijuana at birth, and in April 2018 OCS investigated concerns that Elena was neglecting him but did not substantiate the concerns.

---

[1] We use pseudonyms to protect the family's privacy.

[2] The children are eligible for enrollment in Elena's tribe, making them Indian children within the meaning of the Indian Child Welfare Act (ICWA). *See* 25 U.S.C. § 1903(4) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

OCS was aware of Elena's history of substance abuse and serious mental health issues. OCS had received reports that Elena abused substances while she was pregnant and while caring for the children, and that she was aggressive toward hospital staff when she was admitted for Yuri's birth.

OCS also knew that Ronan had struggled with substance abuse and mental health issues, including long-term depression that sometimes included symptoms of psychosis and post-traumatic stress disorder (PTSD). Ronan's distrust and paranoia had at times prevented him from receiving needed medical care.

In addition to the parents' substance abuse and mental health issues, OCS was concerned about domestic violence in the family. Ronan and Elena had both committed domestic violence in their relationship.

Ronan and Elena have each previously had their parental rights to other children terminated. Elena's rights to children from a prior relationship were terminated in 2012. Ronan's rights to children from a previous marriage were terminated in 2020, after several years of OCS involvement.

In March 2019 Elena was arrested after she physically assaulted her mother, who was watching the children. Both children witnessed the assault, as did a bystander who called 911. OCS later reported that Elena had been intoxicated for several days and that she had threatened to commit suicide.

When police arrived, Elena's mother was being treated by EMTs for a shoulder injury and scratches on her face. Elena was inside the house with the children and refused to come to the door, and the police obtained a warrant.

An OCS caseworker arrived after the police had entered the home. The caseworker observed that the children had injuries "consistent with being hit with an open hand." The police reported to the caseworker that Yannis was wearing a urine-soaked shirt, and there were feces on the floor in the kitchen and soiled diapers throughout the home. The bathtub was filled with dirty water and the bathroom sink contained cigarettes and ash. Pills, a bag of marijuana, a bottle of vodka and energy

drinks were out and open in front of the children. Elena was arrested and charged with assault and child endangerment.

OCS took emergency custody of Yannis and Yuri because Ronan had been arrested a week earlier for a domestic violence assault and remained incarcerated.[3] OCS filed an emergency petition the next day that alleged Yannis and Yuri were children in need of aid under AS 47.10.011 on a number of grounds.[4] OCS was unable to find a suitable relative or Native foster home, so the children were placed in a non-Native foster home.

## B.     Ronan's Participation in Case Plan

The family's initial caseworker met with Ronan in jail after OCS removed the children in March 2019. The caseworker created a case plan for Ronan in May that required him to obtain a parental risk assessment, attend parenting classes, and establish stable housing. The caseworker referred Ronan to agencies that provided the required services and worked with him to find housing options.

Despite Ronan's initial mistrust, the caseworker was able to build rapport with him and they came to work together on case planning. By June Ronan had obtained a substance abuse assessment, started receiving mental health treatment, and signed releases of information for OCS. Ronan met regularly with the caseworker and maintained good contact with her. They created a new case plan together in September, which Ronan had largely completed by October.

Ronan also had regular visits with the children during that time. This caseworker testified that Ronan had a "good bond" with the children and came to visits with snacks and activities. But after Elena showed up to one of his visits at a family

---

[3]     The case against Ronan was later dismissed.

[4]     These included AS 47.10.011 subsections (2) (incarcerated parent), (6) (physical harm), (8) (exposure to domestic violence), (9) (neglect), (10) (substance abuse), and (11) (mental illness).

resource center unannounced, visits were moved from the "more family-friendly" facility to OCS due to safety concerns, which the caseworker testified "was overall a detriment" to Ronan. Elena's behavior at Yuri's scheduled ear surgery in October led to further OCS measures to protect the children and raised concerns about Ronan's ability to protect the children from Elena. The caseworker testified that Ronan grew less engaged and harder to reach after the incident. And the caseworker was soon reassigned in part because of that incident.

After a new caseworker was assigned, Ronan continued to visit the children regularly. This caseworker testified that she had only sporadic contact with Ronan even though the record showed regular email contact between them. And because the caseworker neither documented nor remembered what efforts she had made to help Ronan, it is unclear what occurred between October and June 2020, when another caseworker was assigned.[5]

The third and final caseworker met with Ronan only once after she was assigned in June. At that meeting in September, they discussed Ronan's progress. She filed the petition to terminate parental rights eleven days later.

The caseworker tried repeatedly to meet with Ronan at his home but refused his requests to meet at her office or by phone or videoconference instead. Ronan told her that he was not comfortable with her coming to his home and that he needed to obtain permission for such visits because he was living at a church. A behavioral health assessment Ronan completed in December 2020 had characterized him as "mistrustful," noting that developing trust and rapport would be important to his successful completion of a case plan.[6] But the caseworker attempted at least three unannounced visits to the church where she believed Ronan might be living despite his objections.

---

[5] The caseworker was no longer employed by OCS at the time of trial and had not had the opportunity to review OCS's file.

[6] The assessor also observed that Ronan had shown "the ability to commit to his treatment plan goals" and his prognosis for recovery was fair. The assessor

The caseworker testified that she tried to talk to Ronan about working on his case plan in the summer of 2021 but that he refused to talk to her. She acknowledged that Ronan had requested that she communicate with him through his attorney but stated that it was "just not possible" for her to do so. She testified that from November 2020 until March 2021, her schedule only allowed her to meet with Ronan at his home. She explained that drop-in home visits were convenient for her when she would already be in the area for other caseworker visits.

Ronan began missing videoconference visits with his children in August 2021.[7] When he began attending the visits regularly again a few months later, he often did not speak to the children or would point the camera to the ceiling or at a window.

The caseworker updated Ronan's case plan in February 2022, the first time since September 2019. She noted that Ronan believed he had completed his case plan. There is no evidence that the caseworker made any additional efforts.

## C. Elena's Participation in Case Plan

The first case plan that OCS drafted for Elena in May 2019 required her to complete substance abuse, parental risk, and child development assessments and follow their recommendations, and obtain stable housing. Based on Elena's resistance to mental health treatment in a previous case, the caseworker did not include mental health services in the initial case plan. Elena signed the case plan but later tried to withdraw her signature. She refused to sign any releases of information for OCS to make referrals for treatment.

Elena missed half of her scheduled visits with the children and was often uncooperative with OCS. In June the transportation company that OCS used to get the children to visits refused to continue transporting them after Elena stalked employees,

---

recommended continued outpatient therapy but noted that Ronan had not returned follow-up calls to arrange his participation.

[7] Visits were not taking place in person at the time due to the pandemic.

harassed them in the parking lot, and allegedly slashed their tires. During supervised visits in July and August 2019, Elena accused OCS caseworkers of kidnapping and abusing the children. She called 911 during one of the visits while refusing to let go of one of the children. The caseworker and an OCS supervisor later contacted Elena by phone to discuss the incident and set rules for future visits. Elena refused to agree to the rules and her visitation was suspended.

By October Elena was "pretty steadily escalating unsafely" and had not made any progress on case plan goals. The caseworker emailed and called Elena to collaborate on the case plan but "there was no productive conversation with her." That month Yuri required ear surgery. Ronan gave permission for the operation and he and Elena met Yuri and the caseworker at the surgery center. But after arriving Elena confronted the caseworker and medical staff and raised her fist at the caseworker. Elena was eventually removed from the surgery center by police. OCS consulted with police and developed a safety plan for handling future interactions with Elena.

The caseworker created a new case plan for Elena later in October. The new case plan required her to address domestic violence, mental health, and substance use concerns, and to attend parenting and child development classes and counseling in addition to the assessments required in the initial plan. The caseworker later testified that the case plan was designed to help Elena "communicate without threatening or harassing people."

After the first caseworker was removed from the case following the incident at the surgery center, the next caseworker created another case plan for Elena in January 2020. The new case plan added requirements to complete an anger management program and participate in random drug testing in addition to those in the previous case plans. The case plan also required Elena to comply with visitation rules and communicate with OCS without threats. The caseworker testified that she did not remember what other efforts she made in the case but recalled that it was difficult to reach Elena and that their interactions often involved Elena yelling.

The third caseworker was assigned in June 2020. Elena was incarcerated at that time and was not permitted to have in-person visits due to pandemic restrictions. The caseworker attempted to contact her by phone but Elena refused to speak to her. In late June Elena contacted the caseworker to let her know that she had been released from jail and had a new address. The caseworker called Elena a number of times between June and September, but Elena usually refused to speak to her. When Elena did take calls from the caseworker, she would not talk about case planning or services. The caseworker attempted to set up visits with the children by videoconference, but Elena did not participate.

Elena returned to jail in October. While there Elena told the caseworker that she believed the children were dead. In response the caseworker sent her photographs of the children to prove they were not dead. The caseworker testified that she attempted to coordinate services with the correctional facility, but was told that Elena would have to request the services.

In January 2021 the caseworker scheduled a time to go to the correctional facility to review a new case plan with Elena, including its changed goal of adoption rather than reunification. But when the time came for their meeting, Elena refused to speak with the caseworker and refused to sign the evaluation.

In August another meeting scheduled to go over Elena's case plan progress had to be rescheduled after jail personnel informed the caseworker that Elena was behaving too aggressively to speak to her. Elena refused to accept a scheduled call from the caseworker in September, but did speak to her in October. During that call Elena would not listen to the caseworker and claimed that the children were being burned, bruised, starved, and used in pornography. Elena informed the caseworker that

she had applied for a substance abuse assessment and treatment, but was on the waitlist.[8]

The caseworker had brief phone calls with Elena in November, December, January, and February, but in each call Elena was suspicious of OCS and would not discuss her case plan. The caseworker testified that it was "very, very difficult" to have a conversation with Elena because she rapidly switched between subjects, talked "quickly and aggressively," and was "not willing to engage in any kind of a real conversation about how [to] move forward." Elena made various claims the caseworker could not substantiate, including that the children were being abused, that their daycare had been shut down because of child abuse, and that OCS had denied her a bus pass even though buses were free at the time.

Elena was transferred to the Alaska Psychiatric Institute (API) in March 2022 after she was found incompetent to stand trial in her criminal cases. While at API Elena participated in treatment, including classes and medication. Although the caseworker attempted to set up videoconference visits with the children while Elena was at API, they did not happen because Elena would not agree to OCS's rules for her behavior during visits. The caseworker testified that Elena had not made significant progress on any case plan since the children were removed from her care.

### D. Proceedings

#### 1. Pre-Trial Proceedings

The children were adjudicated in need of aid in October 2019 after a two-day hearing. Ronan stipulated that they were in need of aid under AS 47.10.011(9) (neglect); that OCS had made active efforts to prevent the breakup of the family; and that temporary OCS custody was in their best interests. Elena, who was representing

---

[8]     The record indicates that Elena applied to the facility's Residential Substance Abuse Treatment Program in May 2021 but remained on the waitlist throughout her incarceration. She later tried to find out about obtaining assessments outside the facility.

herself, failed to appear at the hearing, so the court accepted OCS's offer of proof. The superior court found the children in need of aid under subsections (6) (physical harm), (8) (exposure to domestic violence), (9) (neglect), (10) (substance abuse), and (11) (mental illness); that OCS had made active efforts to prevent the breakup of the family; and that temporary OCS custody was in the children's best interests.

## 2. Termination Trial

In September 2020 OCS filed a petition to terminate Elena's and Ronan's parental rights. The trial was held over seven days between February and June 2022. OCS presented testimony from eight OCS workers, a forensic toxicologist, a tribal representative, a child welfare expert, Elena's psychiatrist at API, the children's foster mother, and a police officer. These witnesses testified to the facts described above, including the events giving rise to OCS's removal of the children, the efforts taken by OCS, and the parents' engagement. Ronan and Elena each testified on their own behalf.

OCS called a tribal representative as a cultural expert and a former OCS caseworker as an expert in child welfare as required by ICWA.[9] The tribal representative testified that although the Tribe had not been able to provide any services to the family because they were not living nearby, the Tribe supported the efforts that OCS had made to reunify the family. She testified that the Tribe would support the children's return if the parents worked with OCS and treatment providers to address the issues that endangered the children. The tribal representative testified that because the parents had not made the necessary progress, the Tribe supported the foster parents' plan to adopt the children. The child welfare expert testified that, based upon her review

---

[9] *See* 25 U.S.C. § 1912(f) (requiring qualified expert witness testimony); 25 C.F.R. § 23.122(a) (2023) ("A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child. . . . A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.").

of records from OCS and treatment providers, returning the children to either parent would likely result in serious physical or emotional damage.[10]

Ronan testified and disputed the third caseworker's account that he was difficult to reach. He testified that he was afraid after she showed up at his home unannounced. He testified that he explained "at least half a dozen times" that his experience in the military made him more wary of unannounced visits, but that the caseworker ignored his concerns and continued to do things how she wanted to "with no procedure." He confirmed that he was willing to meet with her at the OCS office or by phone or videoconference. He described feeling "bullied" by the tone of her emails and stated that she broke his trust.

Ronan testified that he completed extensive counseling and classes on parenting, domestic violence, and child development. He testified that for a time he was juggling this case with the OCS case involving his older children, which involved different caseworkers, visitation schedules, and case plans, and was difficult to manage. He also testified that the videoconference visits had become difficult for him because the children were often distracted or off-camera, and he believed that undermined the bond he had developed with them through in-person visits.

The court ordered Elena's phone line to be muted throughout trial because she was interrupting proceedings, using foul language, and making accusations against the court, parties, and counsel. When Elena later testified, she disputed OCS's account of events. She testified that her mother had lied about the assault that resulted in OCS taking emergency custody of the children. She testified that OCS and the foster parents were harming the children. She stated that she believed the children were dead. OCS submitted into evidence court records showing Elena's prior convictions for crimes of dishonesty.

---

[10] *See* 25 U.S.C. § 1912(f).

### 3. Termination Order

The superior court issued a written termination order in November 2022. Although the court acknowledged "the obvious love and concern both parents have expressed for their children," it found that termination of Elena's and Ronan's parental rights was in the children's best interests.

The court found that the children were in need of aid under AS 47.10.011(10) (substance abuse) and (11) (mental health), and that the parents failed to remedy the conduct and conditions that made them children in need of aid. The court noted that the second caseworker's testimony about the services she provided the parents was "somewhat vague" and that the third caseworker did not document her efforts to engage with Ronan "as well as she might have." But it found that there was clear and convincing evidence that OCS had made active efforts. The court noted that although those efforts "were not perfect and at times overly rigid," "the history of parental conduct, the likelihood that such conduct will occur in the future, the significant time it would still take to address the conduct, the present placement, and the parents' stated unwillingness to work with OCS" made it "more likely than not" that termination was in the children's best interests.

The court concluded that OCS proved beyond a reasonable doubt that being placed in their parents' custody would likely result in serious emotional or physical harm to the children, citing ongoing substance abuse and mental health concerns, police involvement, and their repeated incarcerations and institutionalizations.

Elena and Ronan both appeal, arguing that the court erred by concluding OCS made active efforts. In particular Ronan alleges the second and third caseworkers did not meet with him or refer him to services.

## III. STANDARD OF REVIEW

"Whether [OCS] complied with the 'active efforts' requirement . . . is a

mixed question of law and fact."[11]  We will affirm the superior court's factual findings in a CINA case so long as they are not clearly erroneous.[12]  "Whether the superior court's factual findings . . . satisfy ICWA is a question of law to which we apply our independent judgment."[13]  "We bear in mind at all times that terminating parental rights is a drastic measure."[14]

## IV.  DISCUSSION

### A.  It Was Error To Conclude That OCS Made Active Efforts To Reunify Ronan With The Children.

Ronan argues that the last two caseworkers failed to make active efforts to reunify him with his children.  Before terminating parental rights to an Indian child, a court must find by clear and convincing evidence "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[15]  ICWA defines active efforts as "affirmative, active, thorough, and timely."[16]  There is "no pat formula" for determining active efforts[17] and we consider OCS's involvement with a

---

[11]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008).

[12]    *Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 209 (Alaska 2010).

[13]    *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 560 (Alaska 2022) (quoting *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 365 (Alaska 2021)).

[14]    *Id.* (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 761 (Alaska 2009) (internal quotations omitted)).

[15]    *Mona J.*, 511 P.3d at 560-61; *see also* 25 U.S.C. § 1912(d); 25 C.F.R. § 23.120(a).

[16]    25 C.F.R. § 23.2.

[17]    *Mona J.*, 511 P.3d at 561 (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013)).

family "in its entirety."[18]   When OCS's efforts have been inconsistent over time, the court may consider whether the period when active efforts were made compensated for the time during which they were not.[19]

Ronan does not dispute that the original caseworker made active efforts to assist him.  And that caseworker testified positively about Ronan's engagement in completing his case plan, his faithfulness in visiting his children and devotion to them, and her good working relationship with him.  She also testified that changes OCS made in response to Elena's threats and behavior were "overall a detriment" to Ronan, and she was removed from the case due to safety concerns resulting from Elena's behavior.

But Ronan argues that after the first caseworker was reassigned, neither of the subsequent caseworkers made active efforts.  He argues that the second caseworker made no efforts at all and that the third caseworker met with him only once and "artificially conditioned" the success of his case on whether he would agree to a meeting at his home without pursuing other options he proposed, like a phone call or a scheduled meeting at the OCS office.  Ronan argues that his reluctance to work with the third caseworker did not excuse OCS's failure to make active efforts after the first caseworker left.

---

[18]    *See, e.g.*, *Maisy W.*, 175 P.3d at 1268-69.

[19]    *See, e.g.*, *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (holding that OCS's failure to make active efforts over seven months was "insignificant in light of the extensive remedial efforts the state [had] provided throughout its involvement" with the family); *compare Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 607-08 (Alaska 2021) (explaining that failure in one area or for some period does not preclude active efforts finding over entirety of case), *with Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 904 (Alaska 2021) (holding that OCS's active efforts for first half of a four-year-long case did not excuse its failure to make any efforts for latter two years).

The record supports Ronan's argument about the second caseworker. There is no evidence the second caseworker made or documented any efforts with regard to Ronan. The caseworker's vague memory that Ronan "sporadically" contacted her is unsupported and, despite a separate statutory requirement that OCS document its efforts, there is no documentation.[20] OCS failed to demonstrate by clear and convincing evidence any efforts, let alone active ones, between October 2019 and June 2020.

The third caseworker took over in June 2020, following this seven-month lapse in OCS efforts. She met with Ronan for the first and only time three months later, in September. It was not until February 2022 that she updated Ronan's case plan, despite OCS's policy to update case plans every six months. She acknowledged that Ronan had been engaged in case planning and services before the initial caseworker was reassigned.

Despite the pending termination trial and lack of OCS efforts, as well as Ronan's "disengagement" from visits with the children, the caseworker insisted that she needed to meet with Ronan at his home. She testified that she needed to see his home because "if he did prevail in the termination trial, it would be helpful if I could see what his plan was for his boys[, s]uch as where they would sleep." She testified that she attempted to set up in-person meetings with Ronan at his home throughout the summer of 2021.

She also testified that Ronan repeatedly offered to meet with her at her office or to speak to her by phone. She acknowledged that he repeatedly requested that she communicate with him through his attorney, but that she was unwilling to do so.

---

**20**    *See* AS 47.10.086(a)(3); *see also* 25 C.F.R. § 23.120(b) ("Active efforts must be documented in detail in the record."); *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019) (pointing to OCS's "failure to make and demonstrate its efforts" in concluding record lacked sufficient evidence to show OCS made active efforts).

The caseworker was aware that Ronan's recent psychiatric evaluation noted his strong distrust of government institutions and recommended that OCS and service providers work to build rapport with him to overcome his distrust. She acknowledged that she was aware that Ronan had experienced trauma throughout his life, and his assessments indicated a number of mental health conditions, including PTSD that he attributed to his military experiences. But she still made at least three unannounced visits to the church she believed was Ronan's residence.

The caseworker also testified at trial that she made multiple attempts to contact Ronan's lawyer. The documentary evidence presented to the superior court, however, includes only a single automatic reply to an email from Ronan's lawyer to her.

The superior court accurately described the third caseworker's attempts to get Ronan to work with her as "overly rigid." She repeatedly attempted to meet Ronan at his home after he told her he was not willing to do so without his lawyer, he told her how uncomfortable and frightened her unannounced visits made him, and he offered to meet her at her office or by videoconference or telephone.

Ronan argues that both of the latter caseworkers failed to make active efforts. In *Clark J. v. State, Department of Health & Social Services*, *Office of Children's Services*, we held that although OCS made active efforts during the first half of a four-year-long case, by failing to make any efforts in the latter two years, it failed to make active efforts.[21] We held that OCS's failure to make active efforts for the second half of the case "was so egregious that the efforts during the earlier period [could not] make up for it."[22]

OCS's failure to make efforts toward Ronan after the reassignment of the first caseworker is similarly egregious. There is no evidence that the second caseworker

---

[21]    483 P.3d 896, 904 (Alaska 2021).

[22]    *Id.*

made any efforts. And the third caseworker's "overly rigid" insistence on working with Ronan only if he was willing to meet with her at his home — in spite of his documented PTSD and repeated requests to meet elsewhere — resulted in her making no other efforts to assist him. OCS must prove by clear and convincing evidence that it made active efforts toward Ronan, yet it presented no evidence that either the second or third caseworker attempted to "tak[e] [Ronan] through the steps of [his] reunification case plan."[23]

OCS argues that the superior court properly considered Ronan's noncooperation in finding that active efforts were met. But as we recently reiterated in *Mona J.*, "[a] parent's lack of cooperation or unwillingness to participate in treatment does not excuse OCS from making active efforts and proving that it has made them."[24] While we recognized that there are limited circumstances under which a parent's noncooperation can be considered,[25] an active efforts finding "turn[s] on OCS's efforts" rather than a parent's actions, and "OCS must always show that it made active efforts in the first place."[26]

The second caseworker's failure to provide any evidence or testimony about any efforts and the third caseworker's refusal to work with Ronan unless and until he consented to her visiting him at home were not "minor failures."[27] Rather than

---

[23]   *See Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 856 (Alaska 2013).

[24]   *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562 (Alaska 2022).

[25]   *Id.* at 562-63 (listing three ways parent's unwillingness to cooperate can impact active efforts analysis: "(1) it can excuse *further* active efforts once it is clear those efforts would be futile; (2) it can excuse 'minor failures by [OCS]'; and (3) it can influence what actions qualify as active efforts" (emphasis and brackets in original)).

[26]   *Id*. at 563.

[27]   *See id.*

working to overcome the mistrust called to OCS's attention by the psychiatric evaluation it had required of Ronan, the third caseworker's overly rigid approach exacerbated it. OCS proved that it made active efforts for seven months of the three years that it was required to provide them to Ronan. By failing to make active efforts for the vast majority of that time, OCS failed to make active efforts toward Ronan. We therefore reverse the termination of his parental rights.

**B.** **The Court Did Not Err By Concluding OCS Made Active Efforts To Reunify Elena With The Children.**

Elena argues that OCS failed to make active efforts because it did not address her mental illness, provide services while she was incarcerated, and work harder to gain her cooperation.

Elena argues that because her mental illness was "the most significant barrier" to gaining her cooperation, OCS should have tailored its efforts to address it. She argues that OCS should have required a mental health assessment or psychiatric evaluation in her case plan as a necessary starting point for engaging with her in her mental state. But OCS argues that it has reasonable discretion to tailor case plans to the circumstances of each case and individual. OCS presented evidence that in a previous case Elena refused mental health treatment but was willing to participate in substance abuse treatment because she believed that her substance abuse caused her mental health problems. OCS therefore focused the first case plan on substance abuse treatment.

In *Chloe O. v. State, Department of Health & Social Services*, *Office of Children's Services*, we rejected a mother's similar argument that OCS could not meet the requirements of active efforts by "passively accept[ing]" her resistance to mental health evaluation.[28] That mother completed substance abuse treatment after having "outright refused" to participate in mental health services.[29] We agreed with the

---

[28]    309 P.3d 850, 857 (Alaska 2013).

[29]    *Id.* at 853.

superior court's conclusion that OCS had appropriately decided to focus on other services to which the mother was more receptive and affirmed its active efforts finding.[30]

Although Elena did not "flatly refuse" to participate in mental health treatment, she denied having any mental health issues but acknowledged problems with substance abuse.[31] In light of OCS's experience working with Elena in her previous case, it appropriately exercised its "significant discretion to determine how best to provide [active] efforts in light of the facts of the particular case."[32]

Elena also argues that OCS should have done more to assist her while she was incarcerated. She claims that OCS failed to arrange any visitation with the children; failed to take her mental illness into account when it tried to reach her or advise her how to work toward reunification; and failed to identify what services were available to her in prison.

Elena asserts that even though OCS was aware that she was suffering from delusions, it continued to try to talk to her as if she were not. She argues that OCS could have tried to overcome her belief that the children were dead by providing videos or medical records, or allowing her to write to them. OCS responds that it did provide her dated photographs as proof that her children were alive and well. OCS's failure to do more or to have taken the specific steps Elena now argues might have been more effective does not mean that its overall efforts were not active.[33]

---

[30]    *Id.* at 857.

[31]    *See id.*

[32]    *See Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 366 (Alaska 2021) (citing BUREAU OF INDIAN AFFAIRS, U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT § E.4 (2016)).

[33]    *See Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 561 (Alaska 2022) ("A court's concern is not with whether [OCS's]

Elena finally argues that OCS should have done more to connect her with services while she was incarcerated and that it should have sought a court order to enable it to make referrals for mental health treatment. But "requiring OCS to seek court orders for every uncooperative parent would put a huge and pointless burden on [OCS] and the court system."[34] OCS's failure to do so does not render its efforts less than active.

Elena's serious mental illness, her substance abuse, and her increasingly violent threats and behavior required OCS to take stringent security measures and led to Elena's repeated incarceration. When we consider OCS's efforts in light of the entirety of its involvement with Elena and her family, we see no error in the superior court's determination that OCS made active efforts.

## V.    CONCLUSION

We REVERSE the order terminating Ronan's parental rights. We AFFIRM the order terminating Elena's parental rights.

---

efforts were ideal, but with whether they crossed the threshold between passive and active efforts.") (internal quotation marks omitted).

[34]    *Chloe O.*, 309 P.3d at 857 (Alaska 2013) (quoting *Wilson W. v. State, Off. of Child.'s Servs.*, 185 P.3d 94, 102 (Alaska 2008)).