NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ELIZABETH A., | ) |
| | ) Supreme Court No. S-18907 |
| Appellant, | ) |
| | ) Superior Court Nos. 3AN-20- |
| v. | ) 00229/230/231 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF FAMILY & COMMUNITY | ) AND JUDGMENT* |
| SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, | ) No. 2045 – September 4, 2024 |
| | ) |
| Appellee. | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Ian Wheeles, Judge.

Appearances:  Lindsey Bray, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for Appellant. Aisha Tinker Bray, Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellees.

Before:  Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.    INTRODUCTION

A mother appeals the termination of her parental rights to three children, arguing that the Office of Children's Services (OCS) failed to make or document active

---

\*    Entered under Alaska Appellate Rule 214.

efforts to reunite the family pursuant to the Indian Child Welfare Act (ICWA). She also challenges the denial of her request for court-mandated post-termination visitation with the children. Seeing no error or clear error, we affirm the superior court's termination order.

## II. FACTS AND PROCEEDINGS

### A. Family Background And Initial OCS Involvement

Elizabeth A.[1] and Henry D. have three young children: Harlow, Julius, and Nadia. Elizabeth is affiliated with an Alaska Native tribe and her children are Indian children under ICWA.[2]

On April 14, 2020, staff at a supportive transitional housing facility, where Elizabeth resided, observed then two-year-old Harlow "walking around the hallways of [the facility] alone and with a full diaper." After staff members knocked on Elizabeth's door with no response, they entered the room. They then found one-year-old twins Julius and Nadia alone with no adults present. Staff members were unable to get in contact with Elizabeth by phone, though they made contact with Henry, who agreed to watch the children in Elizabeth's room. Henry reported that Elizabeth had left the children alone.

Subsequently, on April 16, facility staff heard a baby crying in Elizabeth's room but could not get a response after knocking. Staff entered the room and observed Elizabeth "passed out," with one child on the floor and two on the bed, all with full diapers. Staff yelled Elizabeth's name multiple times, but did not receive a response. A staff member called the police and OCS.

---

[1] We use pseudonyms to protect the family's privacy.

[2] "Indian child" is defined to mean "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C § 1903(4).

Once the police arrived, Elizabeth met with OCS and admitted to using illicit substances while at a motel in Eagle River from "3:30 am April 12 . . . to 3:00 pm April 15." She claimed that Henry was supposed to be watching the children on April 14 and denied leaving them alone. She also stated that the children had not been to any medical appointments due to transportation difficulties. Finally she disclosed a diagnosis of bipolar disorder and explained she used marijuana, rather than prescribed medication, to treat her condition.

After OCS informed Elizabeth that facility staff had visited her room at 4 p.m. on April 15, when she claimed to be home, and did not find her there, she admitted "that she had no idea when she arrived back to her" room or when Henry left. At that point OCS expressed concerns regarding the children's safety because of continued reports of lack of care or supervision, Elizabeth's inability to recall when she left the children or returned back home, and each parent blaming the other for leaving the children alone.[3] OCS assumed emergency custody of the children and filed an emergency petition for temporary custody.[4]

The day after removing the children OCS performed a drug test on Harlow, and he tested positive for marijuana and amphetamines. OCS temporarily placed the children in a non-ICWA-compliant foster home while it worked to identify suitable placement options with family. In May the superior court entered a temporary custody order finding the children were in need of aid and that active efforts had been made to prevent the breakup of the family. The court subsequently held an adjudication

---

[3] In a later status hearing, Henry admitted he was the one who left the children alone that day, not Elizabeth: "I just wanted to say that it's — I left the kids the day that the OCS called. It wasn't [Elizabeth] who left them; it was me."

[4] OCS alleged the children were in need of aid under AS 47.10.011(1) (abandonment), (6) (risk of physical harm caused by inadequate supervision), (9) (neglect), (10) (substance use), and (11) (mental illness).

trial. It adjudicated the children as in need of aid and decided OCS provided active efforts, maintaining OCS's custody of the children.

### B. OCS's Reunification Efforts

#### 1. OCS's efforts to create case plans and connect the parents with services

The OCS investigator that handled the children's initial removal referred Elizabeth for a substance abuse disorder screening and assessment. Pursuant to this Elizabeth completed an initial screening and interview process for an integrated mental health and substance abuse assessment at the supportive housing facility where she lived in late April and signed a treatment plan with that provider in May. She attended one individual therapy session after the screening but failed to attend subsequent sessions and was discharged from the supportive housing facility in October. The OCS investigator also scheduled weekly urinalysis (UA) from late April until mid-May, but Elizabeth did not attend any of the tests. The case was transferred to an OCS caseworker in May.

The initial caseworker worked on the case from May 2020 until January 2021. He created case plans for Elizabeth and Henry in June, which required them to obtain a substance abuse assessment, participate in random UAs, and complete parenting classes. Elizabeth's case plan also required her to obtain a mental health assessment and to maintain weekly visits with the children. The caseworker followed up with the supportive housing facility where Elizabeth and Henry were already engaged in services and helped to arrange family visitation. The caseworker struggled to reach the parents, and Elizabeth missed multiple scheduled appointments with him. However, she did meet with him in September. During that meeting the caseworker provided Elizabeth with a bus pass and went over her case plan with her.

A new caseworker assumed responsibility for the case in January 2021 and remained assigned to the case through the termination trial. This caseworker created four case plans for Elizabeth and five case plans for Henry. Due to the parents'

lack of progress in treatment, these case plans were very similar to the prior case plans. The caseworker also referred the parents to relevant services. In March 2021 the caseworker gave Elizabeth a bus pass, set up random UAs, and had her sign releases of information (ROIs) so he could monitor her progress with various treatment providers. In April he referred her for housing support and help obtaining her GED. And in May he referred Henry to a peer-to-peer support service that could sit down with him and help him navigate services, but the provider was unable to reach Henry. At another point the caseworker tried to directly schedule an evaluation for Henry for his suspected diagnosis of Attention Deficit Disorder (ADD) while the two met in person, and he left a voicemail with the provider, but Henry never scheduled the evaluation. Elizabeth and Henry never completed random UAs.

Elizabeth completed an integrated mental health and substance abuse assessment in April 2021. The assessment indicated that Elizabeth wanted "to engage in residential treatment and me[t] [the] criteria for" such treatment.[5] However, the primary caseworker would later testify that Elizabeth failed to speak with him from April to October 2021 — save for briefly requesting a bus pass — though she successfully communicated with her attorney and the OCS employee who handled family visitation. In response, the caseworker tried to involve an ICWA advocate designated by Elizabeth's Tribe in the hope that she would be more willing to work with the advocate, but Elizabeth did not engage. In January 2022, the same caseworker left an application for residential treatment for Elizabeth at the OCS offices, which she completed and returned to him the next month. At that point the caseworker had Elizabeth sign ROIs so he could help her complete her application for residential

---

[5]     The primary caseworker appeared unaware for a period of time that Elizabeth completed this assessment in April. For instance, the caseworker wrote in his May 2021 pre-disposition report to the court that he referred Elizabeth for an integrated assessment in April, but then wrote she had "not yet scheduled that assessment" though she had actually completed it.

treatment, but she never entered treatment. According to the caseworker, he again had minimal contact with Elizabeth from November 2022 until March 2023. He testified that both parents struggled overall to consistently meet with the caseworker, though he routinely sent appointment reminders and deferred to their choice of meeting location.

Finally, the caseworker repeatedly sent referrals for family contact. He observed that it was a recurring issue throughout the case for the parents to be taken off the visitation schedule due to their repeated no-shows, until one of them would reach out and the caseworker would get them placed back on the OCS visitation schedule. At one point, after the OCS family contact providers had been unable to schedule with Elizabeth, the caseworker reached out to Elizabeth over Facebook Messenger to personally schedule remote family visitation. He then drove to Eagle River to facilitate a video call between Elizabeth and the children, and when the audio did not work during this visit, he returned four days later to facilitate another video visit at the children's daycare.

### 2. OCS's placement-related efforts

Throughout the case, OCS tried to place the children with family, but its early efforts were complicated by the lack of placement options that OCS deemed suitable and the parents' unwillingness to communicate with OCS. The children were placed with their paternal grandmother and then their paternal uncle, but neither placement ultimately was successful. OCS regularly sought to include both parents in placement review meetings and to consider the parents' views regarding where the children should be placed. Elizabeth attended most of these meetings. The children's final, permanent placement is with a maternal relative in a small community in Alaska.

### C. Termination Proceedings

OCS filed a petition to terminate the parents' rights in March 2022. A termination trial was held over two days in early May 2023. OCS presented testimony

from three OCS caseworkers[6]; a cultural expert on the norms of the children's Tribe; and an expert on child welfare, substance abuse, and mental health.

The cultural expert testified regarding the "child-rearing practices and values" of the children's Tribe. In her view, OCS had "made active efforts to provide services that aligned with the cultural needs of the family," especially in the areas of family placement, visitation, and addiction. She "did not see any cultural implications" that would cause her to question OCS's assessment of safety risks to the children, and she noted that the children were in a placement that would "support their healing and growth," including through connection to the Tribe's language, ceremonies, and traditions. On cross-examination, she agreed it was "not inappropriate from a cultural perspective" for Elizabeth to have post-termination contact with the children, but warned that Elizabeth would have to be consistent and predictable in her children's lives lest she add to their trauma, grief, and loss. She expressed doubt about whether Elizabeth would be able to accomplish that, given her record of missed visits.

OCS's second expert also testified and prepared a report.[7] She testified that Elizabeth's difficulties with substance abuse would place the children "at high risk

---

[6] The OCS investigator who handled the children's initial removal, a caseworker who scheduled family visitation, and the caseworker who worked with the parents from January 2021 through termination testified at trial. The initial caseworker did not testify at the termination trial.

[7] The expert drafted the report in preparation for trial based on information she received from OCS, treatment providers, and elsewhere. Her report included a timeline documenting OCS's efforts. Although Elizabeth challenges OCS's reliance on the report as evidence of the first caseworker's efforts on appeal, we note that the report was admitted into evidence at trial, without objection, as permitted by the CINA rules. *See* CINA Rule 18(f) (stating hearsay evidence "may be admissible at the [termination] trial if it is probative of a material fact, has circumstantial guarantees of trustworthiness, and the appearing parties are given a fair opportunity to meet it"); *D.W. v. State*, 834 P.2d 801, 806 (Alaska 1992) (asserting hearsay evidence must be "sufficiently corroborated by other evidence" to support termination order).

of both physical and mental harm" if returned to her care. On cross-examination she agreed that "meeting a parent where they are might require providing services in the manner in which" OCS can reach them, such as via phone or email as compared to meeting in person.

The superior court issued a decision terminating Elizabeth's and Henry's parental rights in July. It found the children were in need of aid,[8] that neither parent had remedied the conduct or conditions causing the children to be in need of aid,[9] that return of the children to either parent was likely to result in serious emotional or physical harm,[10] and that termination served the children's best interests.[11]

Regarding OCS's efforts toward the family, the court found by clear and convincing evidence "that OCS made timely, reasonable, and active efforts to provide remedial services to prevent the breakup of the Indian Family, and the efforts were not successful."[12] It agreed with the guardian ad litem's and the Tribe's arguments that the primary caseworker's efforts were "extraordinary," and went "far beyond simple active efforts" by attempting to engage both parents even when they failed "to respond or follow through." The court also denied Elizabeth's request for court-ordered post-termination visitation.

Elizabeth appeals.

---

[8]     The court found the children to be in need of aid under AS 47.10.011(1) (abandonment), (6) (risk of physical harm), (9) (neglect), and (10) (substance abuse).

[9]     *See* AS 47.10.088(a)(2).

[10]     *See* 25 U.S.C. § 1912(f).

[11]     *See* AS 47.10.088(c); CINA Rule 18(c)(3).

[12]     *See* 25 U.S.C. § 1912(d).

## III. STANDARD OF REVIEW

Whether OCS fulfilled ICWA's active efforts requirement "is a mixed question of law and fact."[13] "We review the superior court's findings of fact for clear error, but 'we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA.' "[14] "Factual findings are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made."[15]

A court may order post-termination visitation "to the extent that the authorized visitation is in the best interest[s] of the child."[16] We review a court's best interests finding in this respect for clear error.[17]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Determining That OCS Made Active Efforts.

Elizabeth argues that the superior court erred in determining OCS made active efforts "given the lack of documented efforts for nine months early on in the case, or in the alternative, based on the perfunctory efforts made throughout the remainder of

---

[13] *Ronan F. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 539 P.3d 507, 514 (Alaska 2023) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[14] *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 981 (Alaska 2019) (quoting *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 399 P.3d 646, 654 (Alaska 2017)).

[15] *Marcia V. v. State, Off. of Child.'s Servs.*, 201 P.3d 496, 502 (Alaska 2009) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[16] *Burke P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 162 P.3d 1239, 1248 (Alaska 2007) (quoting *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 58 (Alaska 2001)).

[17] *See Ralph H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 255 P.3d 1003, 1008, 1014–15 (Alaska 2011).

the case." OCS asserts it presented enough evidence to demonstrate active efforts both early on and throughout the case. In the alternative, it argues that even if there was insufficient evidence of the first caseworker's efforts, its efforts when considered over the entirety of the case were active. We agree with OCS that its efforts, considered in their totality, were active.

Under ICWA and the CINA rules, before a court may terminate parental rights in the case of an Indian child, OCS must prove by clear and convincing evidence that it made active efforts to prevent the breakup of the family through providing remedial and rehabilitative services, and that these efforts were unsuccessful.[18] In 2016, the Bureau of Indian Affairs (BIA) implemented binding regulations that define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[19] Courts evaluate the record as a whole when determining whether OCS made active efforts.[20] We have explained that "active efforts will be found when OCS 'takes the [parent] through the steps of the plan rather than requiring that the plan be performed on its own,' but not when 'the [parent] must develop his or her own resources towards bringing [the plan] to

---

[18]     CINA Rule 18(c)(2)(B); 25 U.S.C. § 1912(d).

[19]     Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,790, 38,965 (June 14, 2016) (codified at 25 C.F.R. § 23.2). The BIA regulations were designed "to improve ICWA implementation." *See id.* at 38,778.

[20]     *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008); *see also Ronan F. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 539 P.3d 507, 514–15 (Alaska 2023) (stating courts may consider whether period when OCS made active efforts compensated for period it did not).

fruition.' "[21]   Nevertheless, "the active efforts requirement does not require perfection."[22]

A parent's lack of willingness to cooperate with OCS can impact a court's active efforts analysis in three ways: "(1) it can excuse *further* active efforts once it is clear those efforts would be futile; (2) it can excuse 'minor failures by [OCS]'; and (3) it can influence what actions qualify as active efforts."[23]   OCS's failed attempts to communicate and to create a case plan with a parent may constitute active efforts "if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' "[24]   However, a "parent['s] lack of effort does not excuse OCS[]" from its duty to make and document active efforts.[25]

Considering OCS's efforts throughout its involvement with the family in this case, we conclude that the superior court did not err in determining those efforts were active.   First, OCS attempted to facilitate family contact between each of the parents and the children and to consider the parents' wishes when it came to care for

---

**21**     *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013) (third alteration in original) (footnote omitted) (first quoting *N.A. v. State, Div. of Fam. & Youth Servs.*, 19 P.3d 597, 602–03 (Alaska 2001); and then quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1114 (Alaska 2010)).

**22**     *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011).

**23**     *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562–63 (Alaska 2022) (alteration in original) (footnotes omitted) (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1021 (Alaska 2009) (first citing *Wilson W. v. State, Off. of Child.'s Servs.*, 185 P.3d 94, 97, 101 (Alaska 2008); and then citing *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432–33 (Alaska 2015)).

**24**     *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 902 (Alaska 2021) (quoting *Sylvia L.*, 343 P.3d at 433).

**25**     *Bill S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 976, 983 (Alaska 2019).

the children. For instance, OCS regularly included Elizabeth in meetings regarding the children's placement, and attempted to include Henry as well. OCS also attempted two ICWA-compliant family placements favored by the parents, but unfortunately these placement attempts failed. OCS ultimately placed the children with a maternal relative who would maintain the children's connection with their Tribe.

Turning to the reunification efforts made early on in the case, we agree with Elizabeth that the evidence of efforts by the first caseworker is insufficiently detailed to, in itself, support an active efforts determination. The OCS investigator who handled the children's initial removal in April 2020 referred Elizabeth for a substance abuse disorder screening and assessment and to weekly UAs before the case was transferred to an OCS caseworker in May. The initial caseworker did not testify during the termination trial, and the record reflects relatively little documentation of this caseworker's efforts.[26] Nonetheless the evidence available reflects that this caseworker created case plans for the parents — which required them to obtain a substance abuse assessment, participate in random UAs, and complete parenting classes — and followed

---

[26]    *See* 25 C.F.R. § 23.120(b) (2016) ("Active efforts must be documented in detail in the record."). While there is evidence of this caseworker's efforts in the record, and of the initial investigator's efforts, it is not as detailed as the evidence and testimony supporting the primary caseworker's efforts, and the court did not specifically address the investigator's or the first caseworker's efforts in its finding that OCS and the primary caseworker made active but unsuccessful efforts to prevent the breakup of the family. We also observe that the available evidence demonstrates the first caseworker passively referred the parents to services. Since this individual worked on the case for a relatively short amount of time, the lack of evidentiary detail supporting a finding of active efforts during this portion of the case does not undermine the court's overall finding that OCS made active efforts to reunify the family. *See Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (courts evaluate record as a whole when determining whether OCS made active efforts); *Ronan F. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 539 P.3d 507, 514–15 (Alaska 2023) (courts may consider whether period when OCS made active efforts compensated for period it did not).

up with the supportive housing facility where Elizabeth and Henry were already engaged in services. He also facilitated family contact and regularly attempted to reach the parents, but both were difficult to reach and failed to attend several scheduled meetings. When Elizabeth did meet with the initial caseworker in September 2020, he provided Elizabeth with a bus pass and went over her case plan with her.

When the primary caseworker was assigned the case in January 2021, he made frequent and extensive efforts to communicate with the parents in a variety of ways and to connect them to meaningful services. For instance, in March 2021 the caseworker gave Elizabeth a bus pass, set up random UAs, and had her sign ROIs so he could monitor her progress with various treatment providers. The record reflects that the caseworker likely remained unaware for some time that Elizabeth completed an integrated assessment in April 2021. That assessment indicated Elizabeth wanted to engage in residential substance abuse treatment and met the criteria for such treatment. But the record also reflects that Elizabeth failed to speak with the caseworker starting the same month she completed the assessment until October 2021, though she successfully communicated with her attorney and the OCS employee who handled family visitation during this time period. In response, the caseworker tried to involve Elizabeth's Tribe-designated ICWA advocate in the hope she could work more comfortably with that individual, but Elizabeth did not engage. Regardless, even when Elizabeth's communication lapsed, the caseworker continued to regularly reach out to her and worked with her to try to make progress when she reengaged.

After Elizabeth got back in contact with the caseworker, he left an application to a residential treatment program at the OCS offices in January 2022, which Elizabeth completed and returned to him the next month. The caseworker testified that his "hope" at the time "was that [Elizabeth] could get into treatment there and the kids could be placed with her." At that point the caseworker had Elizabeth sign ROIs so he could help her complete her application for residential inpatient treatment, but she never entered treatment and Elizabeth again largely fell out of touch from November 2022

until March 2023. Even so, the caseworker consistently updated the parents' case plans in spite of their reluctance to communicate with him. He also agreed to meet with the parents at their choice of location in the community, and regularly sent appointment reminders.

The primary caseworker made similar efforts toward Henry, including working to link him with a peer-to-peer support service and trying to help him schedule an ADD evaluation.

Finally, the caseworker actively promoted family visitation. For example, he repeatedly referred the parents to the OCS family contact providers after they were taken off the OCS visitation schedule due to multiple no-shows in a row. And after OCS was unable to get in contact with Elizabeth to schedule family contact with her in February 2022, he reached out via Facebook Messenger to personally schedule video visitation. His efforts included driving to Eagle River to facilitate a video call between Elizabeth and the children, and when the audio did not work during this visit, returning four days later to facilitate another video visit at the children's daycare. These efforts were representative of the caseworker's active and thoughtful approach to ensuring that Elizabeth could visit with the children and be involved in their care.

Overall, the record reflects that the primary caseworker made sustained, meaningful, and active efforts to help the parents engage in treatment and to reunite the family, and that those efforts were frustrated by the parents' lack of communication and unwillingness to meaningfully pursue treatment. Further, despite the lack of detail supporting the initial caseworker's efforts, in light of the evidence available and the primary caseworker's efforts, we conclude the superior court did not err in determining that OCS's reunification efforts as a whole were active.

**B.    The Court Did Not Err In Declining To Order Post-Termination Visitation.**

Elizabeth argues the court erred when it declined to order post-termination contact with the children due to concerns about consistency and predictability. She

further argues that placement of the children in a small community far away from her residence is an "extraordinary circumstance" that justifies court-mandated post-termination contact. OCS asserts the court properly denied Elizabeth's request because "there was no evidence post-termination contact would be in the best interest[s] of the children."[27] We conclude the court did not err when it declined to order post-termination visitation.

"[W]hen adequate grounds for termination exist, there is no presumption that the parent should have visitation rights."[28] We have stated that courts may "authorize post-termination visitation in extraordinary circumstances," but only "to the extent that the authorized visitation is in the best interest[s] of the child."[29] In previous post-termination visitation cases, we have considered factors such as the child's need for permanency, the nature or quality of the relationship between the biological parent and the adoptive or pre-adoptive placement, the parent's attitude toward OCS, and evidence of how visitation affects the child.[30] Here, the superior court properly considered these factors when it declined to order post-termination visitation.

---

[27] OCS also argues that Elizabeth "did not actually make a motion at the termination trial to reserve any post-termination family contact" and therefore did not preserve this issue for appeal. However Elizabeth's lawyer twice requested that, if the court terminated Elizabeth's parental rights, it order one visit per year between Elizabeth and the children, and for school photos to be sent to her. The court denied this request on the final day of the termination proceedings. As a result we conclude this issue was preserved for appeal. *See McCavit v. Lacher*, 447 P.3d 726, 731 (Alaska 2019); *Pierce v. State*, 261 P.3d 428, 433 (Alaska App. 2011) ("[B]efore a litigant can invoke the authority of an appellate court to reverse or vacate a trial court's decision, the litigant must demonstrate that they gave the trial judge reasonable notice of their request . . . , and gave the judge a reasonable opportunity to respond to that request.").

[28] *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 57 (Alaska 2001).

[29] *Burke P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 162 P.3d 1239, 1248 (Alaska 2007) (quoting *C.W.*, 23 P.3d at 58).

[30] *Id.; Ralph H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 255 P.3d 1003, 1014-15 (Alaska 2011).

The court supported its finding that post-termination visitation was not in the children's best interests with ample evidence in the record. The cultural expert in this case testified that she did not believe post-termination visitation should be ordered because Elizabeth had not engaged in consistent or predictable contact with the children, had not demonstrated sobriety, and likely would be unable to do so in the foreseeable future. She further testified that post-termination visitation should be in the purview of the permanent placement. The court properly relied on the cultural expert's testimony when it declined to order post-termination contact, as well as evidence regarding Elizabeth's substance abuse and its impact on visitation. The court noted its belief that the permanent placement would continue post-termination contact if "done in a healthy way" with "sober parents." Although Elizabeth points to evidence she views as contradictory, such as the cultural expert's brief agreement that post-termination visitation is "not inappropriate from a cultural perspective," we again observe that the cultural expert ultimately did not favor such visitation because of Elizabeth's challenges remaining sober and consistent in her children's lives. Regardless, "[w]e do not 'reweigh evidence if the record supports the court's finding.' "[31] The court did not clearly err in finding post-termination visitation to be contrary to the children's best interests and did not err in declining to order such post-termination contact.[32]

---

[31] *In re Hospitalization of Rabi R.*, 468 P.3d 721, 734-35 (Alaska 2020) (quoting *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1264 (Alaska 2019)).

[32] Elizabeth's attorney noted during the termination proceedings and in her appellate briefing that Elizabeth would have been able to negotiate post-termination visitation if she had been present at the termination trial and voluntarily relinquished her rights. But Elizabeth was not present at the trial and did not relinquish her rights. Although AS 47.10.089 permits post-termination contact when a parent voluntarily relinquishes parental rights, the statute does not apply here.

## V.  CONCLUSION

We AFFIRM the superior court's termination of Elizabeth's parental rights.